IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| Amy Connelly, | ) | Civil Action No.: 21–CV–00291 |
|     PLAINTIFF, | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| CITY OF ST. ALBANS, VERMONT, | ) | |
| GARY TAYLOR, JASON LAWTON, | ) | |
| and ZACHARY KOCH, | ) | |
|     DEFENDANTS. | ) | |

## PLAINTIFF AMY CONNELLY'S MOTION FOR SUMMARY JUDGMENT FOR CLAIMS AGAINST DEFENDANTS JASON LAWTON, GARY TAYLOR, AND CITY OF ST. ALBANS, VERMONT

NOW COMES Plaintiff Amy Connelly, by and through her attorneys, Chadwick & Spensley, PLLC. and pursuant to Fed. R. Civ. P. 56 and Local Rule 56, moves this Honorable Court to grant summary judgment for claims against Defendants Jason Lawton, Gary Taylor, and City of St. Albans, Vermont in the above captioned matter.

I.    <u>Introduction</u>

On March 14, 2019 Plaintiff Amy Connelly was upset. She had endured a terrible family tragedy, had been drinking alcohol, and was emotionally distraught. Connelly was involved in a dispute at a local bar that brought her to the attention of the St. Albans, Vermont police department (hereafter SAPD). That evening she was arrested by SAPD Officer Zachary Koch.

After she was arrested, Connelly was transported to the SAPD and locked alone in a small holding cell with her hands cuffed behind her back. At some point during this detention Connelly began to kick the cell door. SAPD Officers Zachary Koch, Jason Lawton, and Michael Ferguson went to the cell to address her.

Lawton took the lead, opening the door and instructing Connelly to cease her behavior. She stood up, hands still cuffed behind her back, and Lawton shoved her backward, causing her to fall back onto a bench and strike her head against a wall.  Connelly informed Officer Koch that Lawton had hurt her, and asked for help.  Connelly stood again, raised a leg toward him, and Lawton again shoved her backward onto the bench.  This time, however, Lawton followed up by advancing toward Connelly inside the cell and punching her in the right eye with his closed right fist.  Together, Lawton and Koch then seized the body of Connelly, pulled her out of the cell, and slammed her onto the floor where she again struck her head.  During the entirety of Lawton's interaction with Connelly, her hands were securely cuffed behind her back.

As a result of Officer Lawton and Koch's behaviors, Connelly suffered bruising, swelling, a fractured facial bone, nerve damage, and a brain injury.  The enduring effects of this injury affect her to this day.

For his assault of Amy Connelly on March 14, 2019, Jason Lawton was convicted of assault and sentenced to a term of imprisonment.

For years leading up to this incident, SAPD maintained a formal policy, as well as a custom and practice with the force of policy, which provided that sergeants, including Sergeant Jason Lawton, would review their own use of force incidents.  No supervision or review was conducted by SAPD or Defendant City of St. Albans of Lawton's use of force incidents, including other incidents prior to his assault of Connelly where he had punched other suspects in the head, causing injury.  As a result, Lawton's behavior continued unabated, and culminated in his assault of Amy Connelly.

II.   <u>Factual Background</u>

On March 14, 2019 Amy Connelly was at Shooters Saloon in Saint Albans, Vermont, where she consumed alcoholic beverages and was under the influence of alcohol. Statement of Undisputed Material Facts (SUMF) at ¶1.  Connelly was involved in a dispute, to which the SAPD was called to respond. *Id* at ¶2.  Officer Zachary Koch of SAPD arrived, handcuffed Connelly behind her back, and arrested her. *Id* at ¶3.  Koch transported Connelly to the police station and secured her in a small, locked, cell. *Id* at ¶4.

At some point during her detention in the cell, Connelly began to kick the door and yell in order to gain the attention of an officer. *Id* at ¶5.  Sergeant Jason Lawton went to the cell door, opened it, and engaged in conversation with Connelly.  She stood up and Lawton shoved her backward back down to a seated position. *Id* at ¶6.  Connelly then reported to Koch that Lawton had injured her. *Id* at ¶7.

Connelly stood again, and raised her leg toward Lawton.  In response he pushed her backward again to a seated position on the bench in the cell. *Id* at ¶8.  This time, however, he followed her into the cell and punched her in the right side of the face, in the area of her eye. *Id at* ¶9.  Sergeant Lawton and Officer Koch then grasped Connelly, dragged her from the cell, and slammed her onto the ground. *Id* at ¶10.

Immediately following this incident, SAPD officers shackled Connelly's legs to a bar in the back of the cell. *Id* at ¶14.   Connelly was then left alone lying on the floor.  She attempted to stand but was unable.  She attempted to slide up the door jamb, but was unable. *Id* at ¶15. Connelly was suffering from a head injury caused by police and was left alone on the ground, shackled, with her hands cuffed behind her back. *Id* at ¶ 11, 12, 13, 15.

Lawton's punch to Connelly's head and both Koch and Lawton throwing her onto the floor caused her pain and injury. *Id* at ¶ 11, 12, 13.

Defendant Lawton was arrested by the Vermont State Police for his March 14, 2019 assault of Amy Connelly and on May 18, 2022, Lawton pleaded guilty to that charge. *Id* at ¶16. On December 21, 2022 he was sentenced to a period of incarceration for that conviction. *Id* at ¶17.

For four years prior to the assault of Connelly, SAPD maintained a formal written policy on how and when officers may use force, and articulated when investigation and review by a supervisor would occur. *Id* at ¶18. The written policy required that incidents where officers used force were to be reviewed by a supervisor. Ex. 15 at § VI.C. At the time he punched Connelly, Jason Lawton was a supervisor, a sergeant. Ex. 17 at 94:23-95:1. This written UOF policy in effect at the time Lawton punched Connelly did make reference to managerial review of UOF incidents. It indicated "Additionally, should the supervisor determine that unreasonable force was utilized, the Patrol Commander shall be notified and assume control of the response to resistance investigation." Ex. 15 at VI.C.a.

An additional reference to command staff review of UOF incidents is made in the agency's standard "Response to Resistance" form. This SAPD UOF reporting form had fields for signature for "Supervisor," "Patrol Commander," and "Chief of Police" under the heading "Reviewed by/Signature/Comments." SUMF at ¶19.

On at least five occasions over an eleven month period leading up to Lawton punching Connelly in the face on March 14, 2019, Lawton authored use of force reports that he signed under the "reviewed" section himself. *Id* at ¶20. In at least three of those cases, Lawton punched, elbowed, or in some other manner struck the subject, causing injury. *Id* at ¶21. No higher ranking police manager signatures are on these forms in the "Reviewed By/Signature/Comments" section. *Id* at ¶23. Lawton received no supervision, guidance,

discipline, correction, or feedback after authoring, signing as "reviewed", and submitting these use of force reports. *Id* at ¶32-34. As a result of this lack of supervision, Defendant Lawton continued conducting himself in the same manner when it came to utilizing physical force. *Id* at ¶36.

Chief Taylor first learned of this incident as a potential illegal act by one of his officers on May 22, 2019. Taylor caused the matter to be investigated and he fired Lawton on July 1, 2019. *Id*. at ¶43.

On June 24, 2019 a new use of force policy was promulgated at SAPD. *Id.* ¶28. The policy was modified, at least in part, to address deficiencies that allowed sergeant-supervisors to review their own use of force incidents and reports. *Id* at ¶29. The new policy includes a new section that demands, in part, "The Patrol Commander will, upon receipt of the response to resistance form and shift supervisor report, review all available information within 48hrs. All available information should include, but is not limited to; written reports, audio recordings, and video footage." Ex. 16 at § VI.D.

Chief Taylor believes that the policy, now changed, that allowed Jason Lawton to review his own uses of force was "an unintentional error," and that "It got changed." SUMF at ¶27. SAPD Patrol Commander Jason Wetherby, who held that position at the time Lawton punched Connelly, asserts the SAPD custom and practice of allowing sergeant-supervisors to review and sign their own use of force, was "strange," and responded to the deposition question "Did you find that to be a defective policy" by stating "There was an issue with that policy, sure." *Id* at ¶25. Wetherby further believes that Lawton assaulting Connelly was the "driving force" behind the reporting and review changes that were subsequently made to the SAPD UOF policy. *Id.* at ¶30. When questioned about deficiencies in policy and procedure, Chief Taylor stated, "Yeah.

You know, obviously, who was reviewing these use-of-force reports, and so we changed that." *Id.* at ¶26.

In January 2018, approximately a year before Lawton punched Connelly, he was involved in an SAPD response to a call about a man with a gun. *Id.* at ¶44. During his response to that call Lawton fired his rifle at a suspect. *Id*. at ¶45. He was then placed on temporary administrative leave. *Id.* at ¶46. Soon after, Lawton returned to active duty as an SAPD officer while under investigation for shooting someone and before a legal determination had been made as to the legal propriety of his actions. *Id.* at ¶47. He was eventually found to have been justified in his shooting of the suspect. *Id.* at ¶48.

III.   <u>Standard of Review for Summary Judgment</u>

The granting of summary judgment is proper if this Court determines that no genuine dispute of material fact exists regarding the claims asserted, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Plaintiff Connelly, as the moving party, bears the burden of demonstrating no genuine dispute of material fact exists with regard to the claims for which she seeks summary judgment. *Gallo v. Prudential Residential Services*, 22 F.3d 1219 (2d Cir. 1994). As to those facts, "substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The elements of each claim before this Court for which summary judgment is sought, will dictate which facts are material.

Once Plaintiff has met this burden, non-moving Defendants may only defeat a motion for summary judgment by showing evidence of specific material facts genuinely in dispute. Fed. R. Civ. P. 56(e). It is insufficient for the non-moving party to merely point to potential defenses or vaguely disputed facts. Rather, with regard to material issues, they "must present affirmative

evidence in order to defeat a property supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  Such evidence must, as a matter of law, be "significantly probative," so as to put the fact in dispute. *Id.* at 249.

IV.  <u>Legal Argument for Summary Judgment Against Defendant Jason Lawton for Plaintiff's State Law Claims</u>

A.  <u>The Material Elements of Plaintiff's Claim That She Was Assaulted and Battered by Lawton are Undisputed</u>

As a result of his actions on March 14, 2019, Defendant Jason Lawton was charged with the crime of assaulting Amy Connelly. SUMF at ¶16.  The essential elements of the crime of simple assault in Vermont are that 1) a person; 2) purposely, knowingly, or recklessly; 3) caused bodily injury to another.  13 V.S.A. § 1023.  May 18, 2022, Lawton pleaded guilty to this charge. SUMF at ¶16-17.  For purposes of the charge against Lawton, the state selected the mens rea element of knowingly, and indicated such on the record. Ex. 14 at 00:58-02:04  The Court then had the following exchange with Lawton at his change of plea hearing:

Court: "And did you hear the facts as recited by the state?"

Lawton: "Yes I did your honor."

Court: "And do you agree that at that time and place you did knowingly strike Ms. Connelly in the face with a closed fist causing her bodily injury?"

Lawton: "Yes your honor"

Court: "What is your plea to that charge?"

Lawton: "Guilty."

<u>See</u> Ex. 14 at 20:40-21:10.

In this matter, to satisfy the elements of her assault claim against Defendant Lawton, Plaintiff would have to prove that on March 14, 2019, he 1) acted with intent to cause harmful or offensive contact with Plaintiff or to put her in imminent apprehension of such contact; and 2) Plaintiff is thereby put in such imminent apprehension. Restatement (Second) of Torts § 21.

Lawton has admitted and asserted, through his pleadings in Vermont Superior Court, that he acted with knowing intent when he caused harmful contact with Amy Connelly. Ex. 12; Ex. 14 at 20:40-21:10.  He further indicated through sworn affidavit that he was standing directly in front of Connelly and pushed her backward moments before approaching her and delivering the punch that resulted in his arrest, charge, and conviction. SUMF at ¶6, 8.

After Lawton first pushed Connelly, she stated "he has hurt me," illustrating Connelly's awareness of Lawton's violent act and putting her on notice of his propensity for further physical action. *Id.* at ¶7.  No reasonable jury could reach any other factual conclusion than that Connelly apprehended Lawton's punch.

In this matter, to satisfy the elements of her battery claim against Defendant Lawton, Plaintiff would have to prove that on March 14, 2019, he 1) acted with intent to cause a harmful or offensive contact with the person of Plaintiff or an imminent apprehension of such a contact, and (2) a harmful contact with Plaintiff directly or indirectly results.  Restatement (Second) of Torts §13.  Vermont's Supreme Court has further defined battery as "...an intentional act that results in harmful contact with another. *Christman v. Davis,* 179 Vt. 99 at 101 (2005) citing Restatement (Second) of Torts §13.

The undisputed material facts articulated above satisfy the elements of a battery tort, including Lawton's acting with intent to cause harmful or offensive contact to Connelly.  Again

here, as above, Lawton's own statements at his change of plea hearing articulate that when he knowingly struck Connelly, he caused her bodily injury.

      B.   <u>Defendant Lawton Has Not Denied any of Plaintiff's Claims And Asserted No Defenses</u>

December 17, 2021 Plaintiff filed the above captioned suit.  The same date, a request for a waiver of service of summons was sent to Defendant Jason Lawton.  December 22, 2021 Defendant Jason Lawton, through his attorney of record Kaveh Shahi, executed a waiver of service of summons. Ex. 26.  This service of process resulted in an answer due date for Defendant Lawton of February 15, 2022.  February 14, 2022, Defendant Lawton filed his answer.  To each and every allegation, Defendant Lawton indicated "Defendant asserts his Fifth Amendment right against self-incrimination and respectfully declines to answer." Ex. 27.  In his answer Defendant did reserve the right to assert affirmative defenses some time in the future (*Id.*), but as of this filing, has not done so.

May 18, 2022, in Franklin County, Vermont, Defendant Lawton pleaded guilty to the charge of simple assault for striking Amy Connelly on March 14, 2019. SUMF at ¶16. December 21, 2022 Defendant Lawton was sentenced to a period of incarceration, to be served, for this conviction. *Id.* at ¶17.

On May 30, 2023, Jason Lawton voluntarily answered questions about his conduct on March 14, 2019 related to Amy Connelly.  He did so without compulsion of subpoena, and asserted no Fifth Amendment constitutional protections.  *Id.* at ¶49, 50.

Defendant Lawton is no longer under criminal investigation, indictment, information, or other charging mechanism as a result of any of his actions involving Plaintiff Amy Connelly.

Defendant Lawton has "failed to plead or otherwise defend" this action in any meaningful manner. Fed. R. Civ. P. 55(a). Lawton has failed to admit or deny Plaintiff Connelly's allegations, and has asserted no defenses to her claims, in clear violation of Fed. R. Civ. P. 8(b)(1). Lawton's now unnecessary Fifth Amendment assertions certainly did not "fairly respond to the substance of the allegations" contained in Connelly's complaint. Fed. R. Civ. P. 8(b)(2). Finally, "An allegation - other than one relating to the amount of damages - is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6).

The direct assertions in Connelly's complaint each represent a "short and plain statement of the claim showing that [Connelly] is entitled to relief." Fed R. Civ. P. 8(a)(2). As such, they required a responsive pleading as articulated in Rule 8(b)(6). Lawton's failure to answer, therefore, should be considered by this Court as an admission under Rule 8(b)(6).

C. <u>Even If Defendant Lawton Were Permitted To Untimely File An Amended Answer, He Is Estopped From Denying Plaintiff's Claims</u>

"Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Defendant Lawton, having pleaded guilty in a Vermont State Superior Court, is now precluded from relitigating the issues already litigated and adjudged. Such State litigation carries the "full faith and credit in every court within the United States," including this Court. 28 U.S.C. 1738.

Lawton's assertions at the hearing in which he pled guilty to assaulting Connelly and his own sworn affidavit foreclose the possibility that he deny having acted with intent to cause harmful contact to Connelly, that she apprehended such contact, and that such contact in fact occurred, causing her injury.

The doctrine of issue preclusion, or collateral estoppel, and the associated jurisprudence, demand important elements be satisfied in order for this Court to take the significant step of estopping Defendant Lawton from relitigating these issues.

Vermont law has concluded that "preclusion should be found only when the following criteria are met: (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair." *Trepanier, et al. v. Getting Organized, Inc. and Tommy Styles*, 155 Vt. 259, 265 (1990).  Lawton clearly having been a party to his own criminal prosecution, as well as to this matter, that *Trepanier* factor need not be further argued here.

> i.   *The Issues Surrounding Lawton's Assault And Battery Resulted in a Final Judgment On The Merits*

November 18, 2019 Defendant Lawton was arraigned in Vermont Superior Court, Franklin Unit, Criminal Division on a State of Vermont criminal charge of simple assault in violation of 13 V.S.A. § 1023, and Attorney Rebecca Otey entered her appearance as his advocate for that matter. SUMF at ¶42.   The case wended its way through the court schedule for eighteen months before Lawton pleaded guilty, then an additional six months before he was sentenced. Ex 28.  Throughout this litigation, Lawton was represented by Attorney Otey, and at his change of plea hearing, he confirmed that he had consulted with her and was satisfied with her representation.  Ex. 14 at 15:50-16:20.

Lawton pleaded guilty to the charge of simple assault. SUMF at ¶16.  Notably, he did not plead nolo contendere.  Such a plea might have allowed him to now refute Plaintiff's offensive,

non-mutual assertion of issue preclusion, arguing that he did not admit guilt, but rather that he simply did not contest the allegations.

Even if Lawton had pleaded nolo contendere, which he did not, such a plea would still "admit 'every essential element of the offense [that is] well pleaded in the charge.'" *Lott v. United States*, 367 U.S. 421, 426 (1961), citing *United States v. Lair*, 195 F. 47, 52 (8th Cir. 1912).  Once Lawton's plea was entered into the record, "nothing is left but to render *judgment*, for the obvious reason that in the face of the plea no issue of fact exists," *United States v. Norris*, 281 U.S. 619, 623 (1930) (emphasis added.)  In Lawton's state criminal docket, following an open court recitation of the elements of the offense by the judge, and an articulation of how the State intended to prove each element, Lawton pleaded guilty and Judge Martin Malay then entered final judgment on the record. Ex. 12; Ex. 13.

Turning to the matter of estoppel, "The preclusive effect of a settlement is measured by the intent of the parties to the settlement." *Greenberg v. Board of Governors of Federal Reserve System*, 968 F. 2d 164, 168 (2nd Cir. 1992).  While the resolution of State Docket No. 1569-11-19 Frcr is more accurately described as a plea agreement with a contested sentencing, the concept of 'settlement' articulated by the *Greenberg* court is applicable.  Lawton clearly, explicitly, and under advice of counsel waived his rights to maintain a not guilty plea and demand a trial by jury, to cross examine witnesses and challenge the State's evidence, to subpoena witnesses in his own defense, to testify in his own defense, and to appeal his conviction. Ex. 14 at 10:55-13:48.  Superior Court Judge Malay informed Lawton that by pleading guilty, he would be giving up all of those rights.  When asked, "Do you understand all that?" Lawton responded, "I do, Your Honor." *Id*.

It is clear through the explanations provided and questions asked by Judge Malay and the assertions of Lawton, that it was his intention to fully waive any rights to contest the factual allegations and issues before the Vermont Superior Court, or to offer any affirmative defenses. This follows the 'intent of the parties' language set forth by the *Greenberg* court. Indeed, Lawton certainly would have known, and his attorney would have advised him, of the preclusive effect of that settlement. Lawton's actions and words, himself as well as by and through his attorney, clearly demonstrate his intent.

ii. *The Issues Plaintiff Moves To Preclude In This Action Are The Same As Those Already Litigated And Adjudged In The Previous Action*

Section IV.A. of this document articulates the uniformity of elements necessary to prove the criminal offense of simple assault under Vermont Law, and those before this Court in the tort causes of action of assault and battery. The Court is respectfully referred to that section for argument related to Vermont's applicable *Trepanier* 'sameness' factor.

iii. *Jason Lawton Had The Opportunity To Fully And Fairly Litigate The Issues Before This Court Related To His Assault And Battery Of Amy Connelly*

The United States Supreme Court has not explicitly defined a full and fair litigation. They have, however, recognized that federal courts are "bound by the statutory directive of [28 U.S.C.] § 1738" such that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481 (1982). The *Kremer* court further articulated that "§ 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state

judgments.  Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken." *Id.* at 481-482.

In the matter before this Court, Vermont law favors Plaintiff in considering whether the subject issues have been fully and fairly litigated.  In the Vermont Supreme Court's opinion, "Courts applying [the full and fair litigation] factor must take into account, among other considerations: the parties' incentives to litigate; the foreseeability of future litigation; the legal standards and burdens involved in the two actions; the procedural tools available in each forum; and the possibility of inconsistent determinations of the same issue in separate prior cases." *State of Vermont v. Ashley Nutbrown-Covey*, 204 Vt. 363, 372 (2017).

Taking each factor in turn, Lawton's incentive to fully litigate his state criminal case was significant, as he faced a potential year in prison and a thousand-dollar fine.  Indeed, following the judgment of his guilt, he served a term of incarceration.  When Lawton pleaded guilty he was surely aware of the above captioned matter, as it had already been filed, he had retained a civil attorney, and the matter was in the midst of discovery.  Lawton, fully aware of this subsequent litigation and the preclusive effect of his guilty plea, had "every incentive to litigate the [earlier matter] fully and vigorously." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332 (1979), (discussing the use of offensive collateral estoppel).   The evidentiary standard to find him guilty of the crime of assault was notably stricter than that necessary to find liability in this matter, and the procedural tools available to him in his prosecution were more protective.  In sum, the factors considered by Vermont courts when determining whether an issue has been fully and fairly litigated have been satisfied, and this Court, under the guidance of the Supreme Court's interpretation of 28 U.S.C. § 1738 in *Kremer*, must apply them here.

      *iv.*     *The Issues For Which Plaintiff Seeks To Estop Defendant Lawton Were*

              *Necessarily Decided*

Before a court renders a judgment of guilt, "the prosecution must convince the trier of all the essential elements of guilt." *In re: Winship*, 397 U.S. 358, 361 (1970). Mirroring this logic and citing *Winship*, the Vermont Supreme Court has held "The primary evidentiary concern in each criminal case is that the State must prove each element of the offense beyond a reasonable doubt." *State v. Derouchie*, 140 Vt. 437, 442 (1981). As such, the tort-related issue coincident to each element of simple assault articulated in 13 V.S.A. § 1023 was necessarily found and decided by Judge Malay. Were the judge not to have found the existence of any element, and thereby the issue correlated to it, he would have been unable to accept Lawton's guilty plea and enter a final judgment of guilt.

      *v.*     *Applying Preclusion In this Matter Would Be Fair*

In Vermont, "No one simple test is decisive in determining whether either of the final two criteria are present," when one of those criteria is fairness. *Trepanier* at 265. Instead, "courts must look at the circumstances of each case." *Id.*

The U.S. Supreme Court has similarly held, setting forth in *Hosiery* a desire to "grant trial courts broad discretion to determine when [offensive collateral estoppel] should be applied." *Hosiery* at 331. The federal court, however, has offered some greater guidance to inferior courts when evaluating fairness. One such factor is whether or not the plaintiff in the subsequent action could have joined in the first. *Id*. Such was not the case here, as no legal mechanism existed for Plaintiff Connelly to have joined the State as a party in order to recover damages. Defendant Lawton may argue that Connelly could have obtained restitution in the criminal matter. Such a result would have required the State to seek it, which it did not. Even if it had, Connelly still

would not have been a party joined in that matter.  Another discretionary consideration is whether "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Hosiery* at 330.  Again, such is not the case here.  Finally, as directed by *Hosiery*, this Court should consider that in the subsequent action in which Defendant Lawton would be estopped, there are "no procedural opportunities available…that were unavailable in the first action of a kind that might be likely to cause a different result." *Hosiery* at 332.  In the matter before this Court, contrasted to Defendant Lawton's criminal prosecution before the Vermont Superior Court, there are none.

Vermont's Supreme Court provides conclusive language, asserting that "the party opposing collateral estoppel must show the existence of circumstances that make it appropriate for an issue to be relitigated. *Trepanier* at 587-588.  In this matter, the facts do not support Defendant Lawton making such a showing.

V.  <u>Legal Argument for Summary Judgment Against Defendant Jason Lawton for Plaintiff's Federal Constitutional Claims</u>

As a preliminary matter, as in Plaintiff's state claims, Defendant Jason Lawton has failed to "fairly respond to the substance of the allegations" contained in Plaintiff's federal constitutional claims. Fed. R. Civ. P. 8(b)(2).  Plaintiff reasserts here, for the reasons argued above, that Defendant Lawton has thereby admitted Plaintiff's allegations under Fed. R. Civ. P. 8(b)(6).

To prevail in a summary judgment motion in her 42 U.S.C. § 1983 claims against Jason Lawton, Plaintiff must show that no reasonable jury could return a verdict other than liability for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).  Such is the case here, where no issue of material fact is disputed whereby liability could be denied.

Plaintiff must show when Lawton punched her, he was acting under the color of law. Color of law is synonymous with individual action on behalf of the state.  Such state action can be shown by evidence that "the deprivation [was] caused by the exercise of some right or privilege created by the state" and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West v. Atkins,* 487 U.S. 42, 49 (1988), citing *Lugar v. Edmonsdson Oil Co.,* 457 U.S. 922 (1982).

As articulated above and in Plaintiff's list of undisputed material facts, Lawton himself has conceded he is a state actor.  On March 14, 2019 Lawton was on duty as a City of St. Albans police sergeant. SUMF at ¶2.  Lawton completed official City of St. Albans police forms in order to document his conduct after punching Connelly. *Id.* at 11; Ex. 3.  In these forms, he articulates that he was attempting to control a prisoner (Connelly) held in a jail cell, thereby exercising a 'right or privilege' afforded him by the state. Ex. 3 at ¶4. For allegedly kicking Lawton, Connelly was charged with assaulting a police officer, that enhanced protection (as opposed to assaulting a civilian) being reserved for agents of the state. Ex. 2.  The fact that Lawton was acting under color of law when he punched Connelly is beyond dispute.

That Lawton's actions violated Connelly's constitutional right to be free of unreasonable seizures requires a deeper analysis, as there is no "easy to apply legal test in the Fourth Amendment context." *Scott v. Harris*, 550 U.S. 372, 383 (2007).  Assessing Plaintiff's claim, and this motion, requires this court to "slosh [its] way through the factbound morass of reasonableness." *Id.*

In their assessment of the propriety of police uses of force, federal courts continue to utilize the three factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989).  A determination as to the propriety of police force "requires careful attention to the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Regarding the first prong, the severity of the alleged crime, Connelly had been arrested for an alleged misdemeanor crime of disorderly conduct and unlawful mischief, neither of which are violent offenses. She was in custody, handcuffed behind her back, and seated at the time Lawton punched her. Lawton may assert that Connelly tried to kick him, arguing that this act constituted an assault, and that he was entitled under *Graham* to control her. While such circumstances may carry *some* inherent authority to use force (Graham at 396, emphasis added), that is not the question before this Court. The current question asks "not whether 'some' force was unnecessary" (*Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2nd Cir. 2015), but rather whether the force used by Lawton was excessive.

In the instant matter, it is undisputed that Connelly was handcuffed behind her back and intoxicated. Just prior to punching her, Lawton had pushed Connelly backward and away from him, causing her to fall to a seated position on a bench in a small jail cell. SUMF at ¶8. He then pursued her into the cell, grasped her with his left arm on her shoulder, and punched her in the face with his right fist. *Id.* at ¶9; Ex. 5 at 10:03-10:06. Such a response was grossly excessive given the circumstances.

As to the second prong, Lawton's affidavit alleges that Connelly tried to kick him. Ex. 3 at ¶4. In response to this alleged act, he pushed her back down. SUMF at ¶8. She landed in a seated position, and presented no further threat to him. Indeed, she was handcuffed behind her back, the side of her body faced him, and she was looking down. Ex. 5 at 10:02-10:04. Not one to mince words, Chief of Police Gary Taylor described Lawton utilizing Connelly's alleged kick

as justification for following her into the cell and punching her as "bullshit." Ex. 24 at 152:9-18.

No reasonable jury could conclude that Connelly posed a danger to an officer or to the public at

the time Lawton followed her into the small jail cell and punched her in the face.

As to the third prong, the undisputed facts show that any assertion Amy Connelly posed a

risk of flight or resistance is ridiculous on its face.  Handcuffed in a small room, itself well

within the recesses of the police station, Connelly found herself surrounded on three sides by

solid walls, the one exit blocked by police officers.  When she stood, she was shoved backward.

There was no risk of escape.

In addition to its three-prong analysis, *Graham* requires an overall fact-specific

assessment of the environment in which the force was used.  In conducting such an evaluation,

this Court should consider whether there existed "circumstances that [were] tense, uncertain, and

rapidly evolving." *Graham* at 397.  In that case, officers engaged with an unruly suspect (albeit

for medical reasons) moving unpredictably around a vehicle on a busy street, while investigating

what at least one officer suspected may have been a robbery.  Multiple subjects were on the

scene.  Contrasting *Graham* to this case, Amy Connelly was handcuffed behind her back inside a

small jail cell within a police department.  She was in the presence of at least two officers.  Those

officers controlled the entirety of the circumstances then and there existing.  This was nothing of

the "tense, uncertain, and rapidly evolving" circumstances contemplated in *Graham* (397).  Any

chaos that may have existed was entirely of the officers' construction.  For their part, SAPD

officers Lawton and Koch were required to act as "reasonable officer(s) on the scene" as

contemplated by *Graham* (396).  On March 14, 2019 at SAPD, a reasonable officer would have

recognized the situation as calling for, at the minimum, a brief moment's pause for consideration

prior to leaping into violent action.

The totality of the factual circumstances around Lawton punching Connelly are undisputed, and even when taken in the light most favorable to Defendant, no reasonable jury could consider these facts and find that Lawton's force was reasonable.

VI.   Standard of Review for Plaintiff's Monell Claims against Chief Gary Taylor and City of St. Albans

Using *Monell v. Department of Social Services of N.Y.*, 436 U.S. 658 (1978), as their anchor, a series of U.S. Supreme Court and Second Circuit cases have laid out four primary routes through which a municipality commits vicarious civil rights violations through its employees.   First, *Monell* itself asserted that municipalities "can be sued directly under § 1983 for…relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement …officially adopted and promulgated by that body's officers." *Id.* at 690.

Second, the same court, in recognition that a government's longstanding institutional practices can take on "the force of law," (*Id*)*,* determined that municipalities may be held liable for an employee tortfeasant's conduct "even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*

Third, through *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Court held that inadequate training causes § 1983 liability to extend to an employer when "the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact." *Id.* 388.  Additionally, liability for a municipality's failure to properly supervise an employee can be demonstrated by the satisfaction of three variables.  One, that the policymaker "knows to 'a moral certainty,' that [its] employees will confront a given situation." *Walker v. City of New York*, 974 F. 2d 293, 297 (1992), citing *City of Canton v. Harris,* 489 U.S. 378 (1989).

Two, that type of work done by the employee may present them with a "difficult choice of the sort that training or supervision will make less difficult." *Id.* Three, that the "wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id* at 298.

Fourth, while not entirely foreclosing that deliberately negligent hiring could lead to vicarious §1983 liability, the U.S. Supreme Court has narrowed the circumstances under which such a finding could occur. *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997). In that case they decided that the employer was not liable for an "isolated decision to hire [officer] without adequate screening, because respondent has not demonstrated that his decision reflected a conscious disregard for a high risk that [officer] would use excessive force." *Id.* at 415-416.

The threads connecting each of the four theories of liability demanded by Monell and its progeny are culpability, causation, and conscious choice by the offending employer. Plaintiff asserts that the undisputed material facts set forth with this motion demand summary judgment against both Defendants Gary Taylor and City of St. Albans based on the *Monell* doctrines of actual policy, practice or custom with the force of policy, and failure to supervise.

VII.   <u>Legal Argument For Plaintiff's Monell Claims Against Chief Gary Taylor and City of St. Albans</u>

Many claims previously before federal courts have required plaintiffs to cite nuanced, historical facts and interpreted events in order to cobble together a foundation sufficient to support the high evidentiary burden of a successful *Monell* claim. Plaintiff in this matter need not engage in such gymnastics. Rarely does a case come before the Court where Defendants themselves concede that the policy of Defendant City of St. Albans and Chief Gary Taylor, and

their failure to supervise the tortfeasant, led to the constitutional violations committed by that employee.  This is such a case.

March 14, 2019, the day Lawton punched Connelly, SAPD and the City of St. Albans maintained a written policy on the use, reporting, and review of physical force by their officers that had been in effect since June 24, 2014 (hereafter referred to as UOF policy-1). SUMF at ¶18. On June 24, 2019, SAPD issued a new modified and updated written policy on the same subject (hereafter UOF policy-2). *Id*. at ¶28.

As articulated in the factual background above and evident in the policy itself, UOF policy-1 contained a section discussing the review of physical force used by SAPD officers.  It required supervisors (sergeants) to respond to such incidents, investigate, and review the conduct of the employee-officer who used physical force. Ex. 15 at VI.C.  It further indicated, in part, "Additionally, should the supervisor determine that unreasonable force was utilized, the Patrol Commander shall be notified and assume control of the response to resistance investigation." Ex. 15 at VI.C.a.

Section VI.C.a. of UOF policy-1 provided that a supervisor-employee's opinion was the single determinant factor in whether or not "unreasonable force was utilized," thereby requiring notification of higher authority.  The policy makes no provision whereby a review of the propriety of applied force can be made without referral from the supervisor up the chain of command.  This formal policy created a procedural dynamic through which a supervisor-employee reviewed all force incidents, including those committed by the supervisor-employee themselves.  Such was the case for nearly a year in at least five incidents where Sergeant Lawton had used force against people. SUMF at ¶20.  The sixth was when he punched Amy Connelly, an action Lawton also reviewed and signed off on himself. *Id.* at ¶22.

An additional reference to command staff review of UOF incidents was made in the agency's standard "Response to Resistance" form itself, included as an appendix to UOF policy-1. This SAPD UOF reporting form had fields for signature for "Supervisor," "Patrol Commander," and "Chief of Police" under the heading "Reviewed by/Signature/Comments." *Id.* at ¶19. The undisputed material facts show that, in UOF incidents where Lawton reviewed and signed off on his own conduct, these fields were not completed. *Id.* at ¶23.

For nearly a year this dynamic persisted, with then-Sergeant Lawton repeatedly using force, sometimes punching suspects, then authoring and approving his own use of force reporting documents. He received no supervision, correction, discipline, nor guidance regarding these incidents. *Id.* at ¶32-34. Lawton assumed his work product was within the standards expected by his SAPD superiors and the organization itself. *Id.* at ¶36. That Lawton applied that conclusion on March 14, 2019, resulting in an unreasonable constitutional violation when he punched Amy Connelly in the face, should not surprise this Court.

Defendants may argue that Lawton was not in fact reviewing his own use of force incidents and reports for propriety or appropriateness, but rather for completeness and form. Indeed, Lawton made statements to that effect during his deposition. Ex. 17 at 157:7-22. Defendants may cite to these statements as evidence of a disputed fact, but in doing so they would be disputing a fact that is immaterial, and unnecessary for Plaintiff to prevail on summary judgment. The primary thrust of liability here does not lie in Lawton's review of his own uses of force but rather in the City of St. Albans and Chief Taylor's failure to conduct any type of review or supervision. That fact is undisputed, and Defendants' assertion that Lawton was not "reviewing" his reports but was rather merely ensuring they were complete would be an attempt to distract this Court from those facts that are material.

Defendants City and Chief Taylor may further argue that some nuanced wording within UOF policy-1 and reasonable differences in interpretation render flat Plaintiff's argument.  Even were such an assertion accurate, which it is not, the relevant conclusion supported by the undisputed facts is that the manner in which UOF policy-1 was used and implemented caused Lawton's constitutional violation.  Plaintiff asserts it was used exactly as the City intended.  However, were the court to be persuaded otherwise, *Monell* recognizes that custom and practice can take on "the force of law." (690).

Such is the case here, where the Defendant sergeant (Lawton) who committed the act, mid-managers required to review that sergeant's work performance (Wetherby), and the Defendant Chief of Police (Taylor) have all agreed, through sworn testimony or admission, both that the force used was illegal and that problematic practices related to the use of force review process immediately preceded it.

Whether caused by explicit policy or custom and practice, Defendant Lawton had been signing off on his own punching and elbowing of suspects for nearly a year, with no feedback from superiors, preceding his violation of Connelly's 4th amendment rights on March 14, 2019.

Having established that both explicit policy and common custom caused Lawton's unconstitutional behavior, Plaintiff now argues that Defendants City of St. Albans and Chief Taylor's failures to train and supervise Lawton carry additional vicarious liability worthy of summary judgment.

The Second Circuit, recognizing the precedent of the Supreme Court's three-part analysis for failure to supervise liability, requires that a plaintiff must first "show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation. *Walker* at 297. Chief Taylor and the City of St. Albans knew their officers would use force to such a certainty

that they have had a policy regulating it since at least 2014. SUMF at ¶18.  Lawton himself

reported using physical force, and informed SAPD management that he had, on at least six

occasions in the year leading to his assault of Connelly.  *Id.* ¶20-22.  It is undisputed that Chief

Taylor and City of St. Albans knew their officers would confront situations where they were

required to use force.

    Second, Plaintiff Connelly must demonstrate that a circumstance where SAPD officers

may be called upon to use force "either presents the employee with a difficult choice of the sort

that training or supervision will make less difficult or that there is a history of employees

mishandling the situation." *Walker* at 297.  The undisputed facts in this case contain elements

that demonstrate both, and to such a high degree that no reasonable jury could come to a

different conclusion.

    As to training and supervision making decisions less difficult, SAPD's own policy

recognizes this fact.  Regarding the use of less-lethal weapons, section IV.F of UOF policy-1

indicates, "All deployments must be consistent with departmental use of force training and

policy." Ex. 15 at §IV.F  At deposition, Chief Taylor testified that he received basic UOF training

and also had additional UOF instruction "all the time." Ex. 24 at 10:4-14.  Similarly, Lawton

testified that he was trained in takedowns, striking, arresting, and felony stops.  The training

included a chart with indications as to preferred and less-preferred target points on the body for

strikes. Ex. 17 at 12:13-13:24.  Vermont's Criminal Justice Training Council, responsible for the

training and certification of all Vermont police officers, demands at least ninety-four hours of use

of force training and eighty hours of scenario based training before certification is granted to a

basically trained officer.[1] Ex. 31.

---

[1] The training includes 48 hours of use-of-force and tactics, 4 hours of OC (pepper spray), 40 hours of firearms, and 2 hours of active shooter response.  An additional 80 hours of practical scenarios give trainees an opportunity to practice skills in a controlled environment.

Nearly thirty-five years of complex jurisprudence have followed the landmark *Graham*

decision.  Police tactics and weaponry are updated regularly.  What is and is not reasonable turns

on a multitude of constantly changing variables, requiring officers to make "split second

judgments." *Graham* at 397.  The value of use-of-force training and supervision in making UOF

related decisions less difficult is undisputed.

Controlling jurisprudence requires Plaintiff to show that "the failure to train or supervise

will result in the officer making the wrong decision." *Walker* at 299.  In *Walker*, the court

dismissed a failure to train claim related to perjury, concluding that following an oath to be

truthful and not lie, thereby committing perjury, is "obvious to all without training or

supervision." *Id.* at 299-300.  Contrasting that conclusion to the police use of force, an

insufficiently supervised police officer, considering the complexities of the subject, is likely to

make the wrong decision.  The nuanced laws surrounding police use of force and the

corresponding skill set are not commonly held, as opposed to the knowledge that one should

perjure oneself, which is. See *Walker.*

Having established the first two prongs, Plaintiff must show that mistakes by officers will

"frequently cause the deprivation of a citizen's constitutional rights."*Id.* at 298.  The case before

this Court again can be contrasted sharply with ministerial functions of government articulated in

portions of *Walker.*  Any use of force by a police officer is considered a seizure, and "should be

analyzed under the Fourth Amendment." *Graham* at 395.  As the City of St. Albans and Chief

Taylor have both known since at least 1989, the date of the *Graham* decision, mistakes made by

their officers related to the use of force inherently implicate the Fourth Amendment, and thereby

"frequently" pose significant risk of causing "deprivation of a citizen's constitutional

rights."*Walker* at 298.  Indeed, Chief Taylor himself concedes the connection between excessive force and a violation of civil rights. Ex. 24 at 70:6-11.

As to the existence of "a history of employees mishandling the situation" (*Walker* at 297), City of St. Albans and Chief Taylor as their agent, again present this Court with undisputed evidence of their knowledge of the need to address policy and training deficiencies.  Chief Taylor had found at least six cases of excessive force used by his officers.  SUMF. at ¶37.  One of those officers, Officer Daugreilh, had used excessive force by way of pepper-spraying a handcuffed prisoner in a jail cell. *Id.* at ¶38, 51.  Chief Taylor asserts that he considers the incident where Officer Daugreilh pepper sprayed a handcuffed, jailed suspect a year prior to when Lawton punched a handcuffed, jailed Amy Connelly (*Id.* at ¶39) and the Connelly assault itself are "similarly the same." *Id.* at ¶40.  Indeed, Daugreilh, as Lawton, was on August 8, 2023 himself convicted of assaulting that prisoner. SUMF at ¶51.  While this conviction occurred after Lawton's assault of Connelly, Chief Taylor had knowledge of the incident and concluded it was unreasonable a year before Lawton's actions. *Id.* at ¶39.

An important consideration for the Court here is "whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 128 (2nd Cir. 2004) citing *City of Canton, Ohio v. Harris*, 489 U.S. at 389.  The undisputed facts here indicate with striking clarity the knowledge of Chief Taylor and by extension City of St. Albans, that some of their officers were using excessive force.  The facts further show that SAPD UOF policy-1 allowed employees (sergeant-supervisors) to sign off on their own force incidents.  The decision of City of St. Albans and Chief Taylor not to remedy this circumstance represents a conscious choice.

Serving as compelling evidence of City and Chief Taylor's knowledge that their policies, both explicit and implicit, led to Lawton's constitutional violation, is the fact that they altered and reissued the SAPD use of force policy soon after the violation occurred.  Defendants may argue that periodic review and updating of policies is in fact a feature of good organizational leadership, but in the face of Chief Taylor's own sworn testimony, such an assertion is not a colorable argument.  Chief Taylor himself, as chief policy maker and representative of the City, fully acknowledges that the changes were made to UOF policy-2 as a direct result of flaws in UOF policy-1 that led to Lawton's violation. SUMF at ¶26-29.  Chief Taylor's second in command, a key member of his command staff, made the same assertion.  *Id.* at ¶30, 31.

Chief Taylor's asserted knowledge, under oath, that officers at his department were improperly using force brings into stark relief the vicarious liability held by him and the City of St. Albans for Lawton's deprivation of Amy Connelly's rights.  An effort by Defendants to somehow argue before a jury that the City and Chief Taylor actually were not aware of their negligent failure to supervise, and both the already realized and pending additional consequences of that failure, would not only ring hollow, but would require the Chief to refute his own sworn testimony.  No reasonable jury could come to any conclusion other than that the City of St. Albans and Chief Taylor were deliberately indifferent to the requirement that they train and supervise their officers, and that their failure to do so resulted in Lawton's constitutional violation.

As noted in the Factual Background section of this motion, Defendant Lawton shot a person, and was returned to duty before the legal propriety of that act had been determined. Plaintiff has been unable to find legal precedent or statutory requirement as to the propriety of allowing officers under investigation for shooting someone to return to duty.  As it assigns value

and weight to the facts before it to determine if summary judgment is appropriate, the Court may choose to consider the historical wisdom of Defendant City of St. Albans and Chief Taylor in their varied supervisory decisions.  In doing so, this Court should consider the level of oversight afforded not only to active officers using force generally, but to an officer who, but a year prior, had shot someone and was returned to duty before it was even determined if in doing so, he had committed a crime.

VIII.    Standard of Review for Plaintiff's State Law Respondeat Superior Claims Against Chief Gary Taylor and City of St. Albans

Turning now to Plaintiff's state tort claims against Defendants City of St. Albans and Chief Taylor, she presents here the evidentiary standard required for a finding of liability. "Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich University*, 169 Vt. 118, 122-123 (1999).  Vermont courts have fully accepted this doctrine under the guidance of *Brueckner*, that of the Restatement (Second) of Agency § 219, and Restatement of the Law (Third), Agency § 7.07.

Clearly established Vermont law sets forth the measure by which a factfinder must determine if employee conduct falls within the scope of employment.  It does so if, "(a) it is of the kind the servant is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally used by the servant against another, it is not unexpectable by the master." *Brueckner* at 123, citing Restatement (Second) of Agency § 228(1).

IX.    Legal Argument For Plaintiff's State Law Respondeat Superior  Claims Against Chief Gary Taylor and City of St. Albans

In previous sections of this motion, Plaintiff has shown that the undisputed facts in this case would leave a reasonable jury with no option but to extend liability for Lawton's conduct to the City of St. Albans and Chief Taylor.  In summary here: (a) The use of force by SAPD officers is so clearly understood and expected as "the kind the servant is employed to perform" (*Id.*) that the City maintains a policy directly regulating such conduct.  That policy itself explicitly refers to the potential punching of suspects. Ex. 15 at § III.D., § IV.B.f.  (b) Lawton's punch of Connelly occurred while he was on duty as an SAPD sergeant, and took place within the physical confines of the SAPD police station. SUMF at ¶9.  (c) Lawton asserts that he punched Connelly, a prisoner at the time, in an attempt to control her, an act reasonably designed to "serve the master." Ex. 3 at ¶4. (d) Similar to the argument set forth in section (a), it is beyond dispute that an SAPD officer may be called upon to punch a suspect.  Lawton, particularly, had been doing so and reporting it to his superiors for some time. SUMF 21.

Plaintiff relies upon facts previously set forth in this motion as sufficient to demonstrate that no reasonable jury could come to a determination other than that City of St. Albans and Chief Taylor are vicariously liable for the assault and battery committed by Jason Lawton when he punched Amy Connelly on March 14, 2019.

WHEREFORE Plaintiff Amy Connelly moves this Honorable Court to grant summary judgment for claims against Defendants Jason Lawton, Gary Taylor, and City of St. Albans, Vermont in the above captioned matter, and to provide other relief that the Court finds just.

SIGNATURE PAGE FOLLOWS

Signed at Brattleboro, Vermont, this 11th day of August, 2023.

Amy Connelly

By: */s/ Evan Chadwick*
Evan Chadwick, Esq.
136 High Street
PO Box 6182
Brattleboro, VT 05302
802-257-7161
evan@chadwicklawvt.com
*Attorney for Plaintiff*