UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 MAY -3 PM 3: 51

CLERK
BY ____
DEPUTY CLERK

AMY CONNELLY,                                    )
                                                )
Plaintiff,                                       )
                                                )
v.                                               )     Case No. 2:21-cv-00291
                                                )
CITY OF ST. ALBANS, VERMONT;                     )
GARY TAYLOR, individually and in his             )
official capacity as Chief of Police for the City )
of St. Albans, Vermont; JASON LAWTON,            )
individually and in his official capacity as a   )
police officer for the City of St. Albans,       )
Vermont; and ZACHARY KOCH,                       )
individually and in his official capacity as a   )
police officer for the City of St. Albans,       )
Vermont,                                         )
                                                )
Defendants.                                      )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART PLAINTIFF AMY**
**CONNELLY'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING**
**DEFENDANT GARY TAYLOR'S MOTION FOR SUMMARY JUDGMENT**
(Docs. 61 & 63)

Plaintiff Amy Connelly brings this action against the City of St. Albans, Vermont

(the "City"); Gary Taylor, individually and in his official capacity as the City's Chief of

Police ("Chief Taylor"); and Jason Lawton ("Sergeant Lawton") and Zachary Koch

("Officer Koch"), individually and in their official capacities as police officers for the

City (collectively, "Defendants"). Plaintiff alleges violations of her constitutional rights

under the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 and

asserts state law tort claims arising from a physical altercation that occurred on March 14,

2019 while she was detained at the City of St. Albans Police Department (the "SAPD").

Plaintiff asserts the following claims against Sergeant Lawton: violation of her

Fourth and Fourteenth Amendment rights against excessive force and failure to intervene

to prevent the violation of these rights under 42 U.S.C. § 1983 (Count I); assault (Count II); battery (Count III); intentional infliction of emotional distress ("IIED") (Count IV); and gross negligence (Count V).

She asserts Chief Taylor's and the City's respective failures to adequately screen, control, train, supervise, and discipline police officers violated her rights under the Fourth and Fourteenth Amendments (Count I) and were negligent under state law (Count VI).[1]

On August 11, 2023, Plaintiff moved for summary judgment, seeking judgment as a matter of law in her favor and against Sergeant Lawton,[2] Chief Taylor, and the City. (Doc. 61.) On October 2, 2023, Sergeant Lawton, Chief Taylor, and the City filed separate oppositions to Plaintiff's motion. (Docs. 76, 77, & 78.) On October 16, 2023, Plaintiff filed a reply, (Doc. 82), and the court took her motion under advisement.

On August 15, 2023, Chief Taylor moved for summary judgment, seeking dismissal of Plaintiff's claims against him. (Doc. 63.) On September 29, 2023, Plaintiff opposed the motion, (Doc. 75), and Chief Taylor replied on October 13, 2023, (Doc. 79), at which point the court took his motion under advisement.

Plaintiff is represented by Evan Chadwick, Esq. The City and Chief Taylor are represented by Michael J. Leddy, Esq. Sergeant Lawton is represented by Kaveh S. Shahi, Esq.

## I.    Whether the Court Should Consider Evidence of Subsequent Changes to the SAPD's Policies.

The SAPD's had a Response to Resistance policy (the "Response to Resistance Policy") which was amended post-incident on June 24, 2019 and now states:

> The Patrol Commander will, upon receipt of the response to resistance form and shift supervisor report, review all available information within 48[] [hours]. All available information should include, but is not limited to[:] written reports, audio recordings, and video footage. Should the Patrol

---

[1] The court previously granted the City partial summary judgment with regard to Plaintiff's negligence claim based on the doctrine of municipal immunity. (Doc. 83 at 5.)

[2] Plaintiff seeks summary judgment on her claims against Sergeant Lawton and does not specifically address her IIED and gross negligence claims against him. The court thus does not address these claims. *See In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 181 n.7 (2d Cir. 2021) (explaining that courts "are not in the practice of opining on issues not raised").

> Commander determine that policy was not followed or a crime was
> committed[,] they should immediately forward all documentation and
> findings to the Chief of Police to determine the course of action.

(Doc. 61-13 at 9.) Plaintiff asserts these changes were motivated by her incident and were

intended to address, at least in part, an alleged custom of sergeants "reviewing" their own

response to resistance forms ("RTR forms"), citing Chief Taylor's deposition testimony

acknowledging that the language of the former policy was "problematic" and could be

interpreted to allow sergeants to review their own uses of force.

The City and Chief Taylor argue subsequent remedial measures may not be used

to establish their liability under Fed. R. Evid. 407.[3] *See Luera v. Snyder*, 599 F. Supp.

1459, 1463 (D. Colo. 1984) (concluding that "proposed testimony of changes made in

police department policies after the incident is not admissible because of the public

policy of encouraging subsequent remedial measures[]"). The court agrees. For this

reason, changes to the SAPD's Response to Resistance Policy are inadmissible at the

summary judgment stage and at trial absent an appropriate other "purpose." Fed. R. Evid.

407; *see also Picard v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) ("Only

admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment, and a district court deciding a summary judgment motion has broad

discretion in choosing whether to admit evidence.") (alteration adopted) (internal

quotation marks and citation omitted).

## II.    Undisputed Facts.

### A.    Background and Law Enforcement Policies.

The City is a municipality that owns, operates, manages, directs, and controls the

SAPD which handles over 12,000 incidents per year. At all relevant times, the SAPD

employed approximately thirty sworn police officers, including Sergeant Lawton, Officer

---

[3] "When measures are taken that would have made an earlier injury or harm less likely to occur,
evidence of the subsequent measures is not admissible to prove . . . negligence[ or ] . . . culpable
conduct[.]" Such evidence may nevertheless be admitted "for another purpose, such as
impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary
measures." Fed. R. Evid. 407.

Koch, and Chief Taylor. Chief Taylor was the City's Chief of Police from July 2005 through January 1, 2020. At all relevant times, the SAPD's chain of command, in descending order, was: the chief, lieutenants, sergeants, corporals, and patrol officers.

Chief Taylor had two commanders, Lieutenant Jason Wetherby ("Lieutenant Wetherby") and Lieutenant Ben Couture ("Lieutenant Couture"). His duties included reviewing use-of-force policies and making recommendations regarding education and training for and discipline of SAPD officers. Chief Taylor did not have the authority to act unilaterally regarding hiring or terminating SAPD officers.

Effective January 1, 1993 through at least March 2019, the SAPD had "General Rules of Conduct" which stated, "Officers shall use only the minimum force necessary to accomplish a legitimate law enforcement purpose[,]" and provided, "Employees of the [SAPD] will strive to be civil and courteous. They will maintain an even disposition and remain calm, regardless of provocation, in executing their duties." (Doc. 63-8 at 9-10.)

In March 2019, the SAPD also had a policy concerning Title VI of the Federal Civil Rights Act of 1964 that stated, in pertinent part:

> It is a crime for one or more persons acting under the color of law willfully to deprive or conspire to deprive another person of any right protected by the Constitution or laws of the United States.
>
> . . .
>
> The types of law enforcement misconduct covered by this law include excessive force, sexual assault, intentional false arrest, or the intentional fabrication of evidence resulting in a loss of liberty to another.
>
> . . .
>
> No member of the [SAPD] will knowingly and intentionally engage in, participate in, or otherwise act in a manner to violate the Federal or State Constitutional civil rights of another.

*Id.* at 10-11 (emphasis omitted).

Effective from June 24, 2014 through at least March 2019, the SAPD's Response to Resistance Policy stated:

> The policy of this department is to protect and serve all citizens while at the same time respecting the rights of suspects and balancing the need for officer safety in response to resistance events. It is the policy of this

> department that officers will use only reasonable force to bring an incident
> or event under control. Reasonable force is only that force which is
> necessary to accomplish lawful objectives. All responses to resistance must
> be objectively reasonable.

(Doc. 61-12 at 1-2.) The Response to Resistance Policy mandated "that [SAPD officers] accurately, completely[,] and timely report subject control of active resistance and a supervisor conducts a prompt investigation and reports this investigation['s] findings." *Id.* at 9.

The Response to Resistance Policy contained procedures for reporting certain uses of force, including "[h]ard [h]and [c]ontrol" such as "punches and other physical strikes[,]" *Id.* at 3, and provided that "[o]fficers who become involved in an incident that required any reportable force option are required to immediately notify their supervisor." *Id.* at 9. The reporting officer was required to "provide a detailed documentation of the use of force utilized in the official police report prepared for the incident involved." *Id.* "[A] supervisor[,]" in turn, was required to prepare a "Report of Response to Resistance (RTR) form" that provided a detailed narrative account describing the actions of the suspect, the reasons for and types of force used, and the suspect's injuries or complaints of injuries. *Id.* Supervisors then completed an RTR form "prior to completing their shift and submit it along with the officer's report to the Patrol Commander for review." *Id.*

Thereafter, a supervisor was instructed to conduct an investigation. In doing so, the supervisor was required to interview the suspect, if cooperative, to obtain his or her account of the incident. If the suspect made a complaint, the supervisor completed a "Public Service Report." *Id.* If the suspect had "any type of injury, Internal Affairs or the Patrol Division Commander w[as to] be notified." (Doc. 61-12 at 10.) "Additionally, should the supervisor determine that unreasonable force was utilized, the Patrol Commander w[as to] be notified and assume control of the response to resistance investigation." *Id.*

"The supervisor investigating the use of reportable force [was] responsible for the review and approval of the officer's reports of the incident, when practicable." *Id.* The policy did not specify the rank of or otherwise define a "supervisor."

The SAPD's RTR form stated at the top, "supervisor is to complete this form in detail[,]" "copy of completed incident report is to be attached[,]" and "original ([with] attachments) will be forwarded to the Patrol Commander's office as soon as possible." *Id.* at 11. The RTR form had a signature block titled "Reviewed By/Signature/Comments" that contained signature lines for a "Supervisor," "Patrol Commander," and "Chief of Police." *Id.* at 14-15. A Patrol Commander is a lieutenant. (Doc. 63-2 at 9, ¶ 70.)

SAPD officers receive training on the use of force that involves viewing a diagram of the human body which distinguishes between safe and unsafe areas where force can be applied. The head, heart, and spinal region are identified as vulnerable areas subject to high levels of trauma.

## B. The March 14, 2019 Incident.

On March 14, 2019, at approximately 7:55 p.m., SAPD Sergeant Lawton, Officer Koch, and Officer Michael Ferguson ("Officer Ferguson") were on-duty and responded to a report of a disturbance at a bar which alleged a suspect had assaulted an employee. Sergeant Lawton was the supervising officer and only sergeant on duty that evening. Lieutenant Wetherby was Sergeant Lawton's direct supervisor at the time but was not present. Chief Taylor was not on duty. Officer Koch arrested Plaintiff, handcuffed her behind her back, drove her to the SAPD station in a police cruiser, and placed her in a holding cell.

While Plaintiff was in the holding cell, she began kicking the holding cell's door and yelling. Sergeant Lawton heard the disturbance from the officers' room, walked to the holding cell, and activated his body camera. Sergeant Lawton opened the door and found Plaintiff sobbing. He told her to stop kicking the door. Plaintiff continued to cry as she stood up. Sergeant Lawton instructed Plaintiff to sit down. She refused and took a step towards him. Sergeant Lawton shoved Plaintiff backwards onto the bench in the holding cell, saying, "Don't come at me like that." (Exhibit 6 at 00:42-00:47.) Plaintiff responded, "How fucking dare you?" *Id.*

Officer Koch approached the holding cell and stood in the hallway behind Sergeant Lawton who told Plaintiff, "Listen to me real good." *Id.* at 00:48-00:47. Plaintiff

6

looked at Officer Koch and said, "He has hurt me." *Id.* at 00:48-00:51. Sergeant Lawton told her to "[s]hut up[.]" *Id.* at 00:51-00:52. Plaintiff stood up and kicked him in the shin.[4] Less than three seconds later, as Sergeant Lawton stepped forward, he let go of the door, which began to close until Officer Koch grabbed it and partially entered the holding cell. Sergeant Lawton pushed Plaintiff back with his right hand, grabbed her shoulder with his left hand, and punched her in the face with his right hand. Plaintiff testified the strike to her face "felt like no pain [she] had ever felt before." (Doc. 61-2 at 3, ¶ 12.)

After punching Plaintiff, Sergeant Lawton grabbed her neck with his left hand and her right arm with his right hand. He turned Plaintiff towards the holding cell door and Officer Koch and said, "You fucking kick[ed] me[.]" (Exhibit 10 at 00:4-00:05.) As this occurred, Officer Koch stepped back from Sergeant Lawton and Plaintiff. Sergeant Lawton pushed Plaintiff out of the holding cell into the hallway. As Sergeant Lawton pushed Plaintiff, Officer Koch backed out of the cell and reached towards Plaintiff's arms, making contact with Plaintiff's left arm. Plaintiff fell on the floor and hit her head.

Officer Ferguson arrived at the holding cell. He and Sergeant Lawton held Plaintiff to the ground while Officer Koch obtained shackles to secure Plaintiff's legs to the back of the holding cell. Sergeant Lawton and Officer Ferguson lifted Plaintiff into a kneeling position in the doorway of the holding cell. Ten minutes later, two EMS personnel arrived and examined Plaintiff before taking her by ambulance to a hospital where she was diagnosed with "[c]ontusion of eyeball and orbital tissues, right eye[.]" (Doc. 61-2 at 3, ¶ 13.)

Following this incident but during the same shift, Sergeant Lawton completed a RTR form. On the form, he checked a box that Plaintiff had a visible injury, which he described as "[c]ontusion on right side of face[,]" (Doc. 61-8 at 1), and indicated Plaintiff required medical attention. He also checked boxes that he used a bent wrist takedown and

---

[4] Plaintiff asserts she "raised her leg toward[s]" Sergeant Lawton. (Doc. 61-2 at 2, ¶ 8.) The videos of the incident, however, show that Plaintiff kicked Sergeant Lawton. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (explaining that, when a videotape captures the events in question and no party contends the video was doctored or altered, courts should "view[] the facts in the light depicted by the videotape[]" at summary judgment).

7

a "[p]unch" and filled out the "Reviewed By/Signature/Comments" field for a supervisor with his name and signature. *Id.* at 3-4. Pursuant to his usual practice, Sergeant Lawton placed the RTR form in Lieutenant Wetherby's mailbox. Lieutenant Wetherby received the RTR form and ensured it was complete. When asked if Sergeant Lawton determined his use of force against Plaintiff was appropriate, Lieutenant Wetherby answered, "[y]es." (Doc. 63-5 at 13.) The field spaces for "Patrol Commander" and "Chief of Police" signatures were left blank.

At some point in time, Lieutenant Wetherby and Sergeant Lawton had a brief conversation about the RTR form. Lieutenant Wetherby filed the RTR form but never signed it. Sergeant Lawton has no knowledge of what happened to the RTR form after he provided it to Lieutenant Wetherby. Between March 14, 2019 and June 1, 2019, Lieutenant Wetherby did not communicate with Sergeant Lawton or any other SAPD officer regarding the incident with Plaintiff. Lieutenant Wetherby was aware there were no prior allegations of misconduct involving Sergeant Lawton.

Chief Taylor did not review Sergeant Lawton's RTR form immediately after it was filed because he was not aware there had been an incident. He does not know if anyone else in the chain of command reviewed Sergeant Lawton's RTR form at the time. He first learned of Sergeant Lawton's actions on May 22, 2019 when a public records request was made concerning the incident with Plaintiff.

On May 28, 2019, Chief Taylor instructed Lieutenant Couture, the records custodian, to obtain responsive records and make copies of them. While making copies of the videos of the incident, Lieutenant Couture advised Chief Taylor that he saw "improprieties that may require an internal investigation." (Doc. 63-2 at 12, ¶ 92.)

On June 2, 2019, Chief Taylor met with Lieutenant Couture and Lieutenant Wetherby and assigned Lieutenant Wetherby to conduct an internal investigation of the incident. Lieutenant Wetherby interviewed Sergeant Lawton on June 5, 2019, and Sergeant Lawton admitted to shoving, punching, and taking down Plaintiff. Sergeant Lawton explained that he struck Plaintiff's face to stop her aggressive behavior, and it was successful for this purpose. Sergeant Lawton confirmed his responses in his RTR

form and accompanying narrative were accurate. During the investigation, Chief Taylor was informed that law enforcement officers are trained not to deploy "distraction" strikes against a suspect's head, heart, or spinal cord. (Doc. 63-2 at 13, ¶ 105.) He did not find Sergeant Lawton's claims that he used a "distraction" strike against Plaintiff credible, calling it "bullshit." (Doc. 61-21 at 152.) Chief Taylor characterizes Sergeant Lawton's use of force against Plaintiff as "unnecessary and excessive[.]" (Doc. 63-4 at 7.) From his review of the videos of the incident, he does not believe Sergeant Lawton acted in accordance with SAPD training.

On June 12, 2019, Sergeant Lawton was placed on administrative leave, and on June 17, 2019, Chief Taylor sent him a memorandum titled "Pre-Termination Hearing[.]" (Doc. 63-10 at 1.) The memorandum described the investigation regarding Sergeant Lawton's use of force against Plaintiff, Chief Taylor's findings, and the policies violated by Sergeant Lawton's actions. It provided Sergeant Lawton notice of a pre-termination hearing. A pre-termination hearing was held on June 27, 2019, and on July 1, 2019, the City and Chief Taylor terminated Sergeant Lawton's employment because of the incident with Plaintiff. A union representing Sergeant Lawton challenged his termination but was unsuccessful.

For failing to report Sergeant Lawton's misconduct, Officer Koch received a one-day suspension without pay and was required to undergo remedial training on use of force and prisoner care. Prior to this, Officer Koch had never been suspended for misconduct. Officer Koch assured Chief Taylor that "nothing like th[is] would ever happen again." (Doc. 63-2 at 15, ¶ 113) (internal quotation marks omitted).

On November 15, 2019, Sergeant Lawton was charged in Vermont Superior Court with simple assault in violation of 13 V.S.A. § 1023 for punching Plaintiff in the face on March 14, 2019. He was arraigned and pled guilty on May 18, 2022. The State proffered that "on or about March 14, 2019, [Sergeant] Lawton at St. Albans knowingly caused bodily injury to another by striking [Plaintiff] in the face with a closed fist while [Plaintiff] was restrained in a holding cell and handcuffed behind her back thereby causing [Plaintiff] bodily injury." (Exhibit 14 at 17:27-18:02). Sergeant Lawton agreed

9

that he "knowingly str[u]ck [Plaintiff] in the face with a closed fist causing her bodily injury[.]" *Id.* at 20:40-21:10. The court accepted the guilty plea and entered a conviction. On December 21, 2022, Sergeant Lawton was sentenced to a term of incarceration for assaulting Plaintiff and a judgment was entered against him and in favor of the State of Vermont.[5] *See State v. Merch.*, 790 A.2d 386, 390 (Vt. 2001) (citing Vt. R. Crim. P. 32(b)) ("[T]he entry of judgment after sentencing constitutes final judgment, not the entry of the plea.") (footnote omitted).

## C.     Prior Uses of Force.

In the eleven months preceding the incident, Sergeant Lawton signed the supervisor field on RTR forms regarding his own use of force on at least five occasions. At least three of the five RTR forms described punching, elbowing, kneeing, or otherwise striking individuals and causing injury. No SAPD Patrol Commander or Chief of Police filled out the field to indicate they reviewed these RTR forms. Although Sergeant Lawton knew his RTR forms were supposed to be reviewed by a superior, he did not have subsequent conversations with his superiors about the RTR forms.[6]

On January 2, 2018, Sergeant Lawton, Lieutenant Wetherby, and a third officer responded to a call of a man with a firearm. During their response, Sergeant Lawton fired his duty-rifle at the suspect. This call was the first time in Chief Taylor's career as a law enforcement officer any officer he supervised was involved in a shooting incident. After the shooting, Chief Taylor spoke with the three officers involved about seeking medical attention at a hospital as well as about their right to contact a union attorney. The three officers went to the hospital after the shooting and were all subsequently temporarily

---

[5] Pursuant to Fed. R. Evid. 201, the court takes conditional judicial notice of the Vermont Superior Court docket in *State of Vermont v. Jason Lawton*, 1569-11-19 Frcr. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (explaining "docket sheets are public records of which [a] court [can] take judicial notice"); *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020) (stating "state court decision[s] . . . [are] appropriate for judicial notice" as public records).

[6] As Defendants point out, there is no evidence that Sergeant Lawton's actions on these preceding occasions were unlawful or violated any SAPD policy. There is also no affirmative finding to the contrary.

placed on administrative leave. The Vermont State Police (the "VSP") initiated an investigation of the incident.

Thereafter, Lieutenant Wetherby was informed he would not be permitted to return to duty until he met with a mental health professional. Although Chief Taylor connected Sergeant Lawton with a mental health professional, Sergeant Lawton was resistant to speaking with him. Sergeant Lawton scheduled a meeting, however, it was cancelled, and Sergeant Lawton ultimately did not meet with a mental health professional while employed by the SAPD.

Chief Taylor recalls Sergeant Lawton expressing feelings of isolation and ostracization and a desire to return to duty during his administrative leave. A major with the VSP advised Chief Taylor that the officers involved in the shooting could return to duty if they had done nothing wrong. Chief Taylor also consulted with Lieutenants Wetherby and Couture and with the City Manager regarding whether it was appropriate for Sergeant Lawton to return to duty. Based on the information Chief Taylor received from the VSP investigators and Sergeant Lawton, he concluded Sergeant Lawton had not acted improperly and authorized Sergeant Lawton to return to duty. Sergeant Lawton's total time on temporary administrative leave was less than two weeks. When Sergeant Lawton returned to duty, the VSP investigation of the shooting was ongoing. On March 16, 2018, the VSP concluded the shooting was justified.

After Sergeant Lawton returned to duty, Chief Taylor did not notice a change in his behavior. He was unaware Sergeant Lawton had any mental health concerns. On at least one occasion, Chief Taylor contacted Sergeant Lawton to see how he was doing and to ask if he wanted to speak to a counselor. At some point later, Chief Taylor met with Sergeant Lawton and Lieutenant Couture because Lieutenant Couture had criticized Sergeant Lawton's conduct during the shooting. At Chief Taylor's direction, Lieutenant Couture apologized to Sergeant Lawton.

Sergeant Lawton claimed he informed Lieutenant Wetherby he was unable to continue police work, however, Lieutenant Wetherby does not recall this conversation. Chief Taylor and Lieutenant Wetherby never received reports that Sergeant Lawton was

11

abusing alcohol or struggling with mental health issues after the shooting. Lieutenant Wetherby asserts Sergeant Lawton did not ask him for help, and Chief Taylor testified he did not observe any behavior that led him to believe Sergeant Lawton was not fully capable of performing his duties.

During his tenure, Chief Taylor had infrequent contact with Sergeant Lawton until Sergeant Lawton became the union's president. At that time, his contact with him became more regular. The collective bargaining agreement between the City and the union determined how many hours an officer could work in a given time period. Sergeant Lawton did not advocate for a change in working hours when he was union president. Chief Taylor was not aware of how many overtime hours Sergeant Lawton worked.

On at least six occasions in fifteen years, Chief Taylor found a SAPD officer used force in violation of SAPD policy. On one of these occasions, which took place approximately one year before the incident with Plaintiff, Officer Joel Daugreilh ("Officer Daugreilh") used pepper spray on an arrestee detained in a holding cell. The morning after this incident, Lieutenant Couture informed Chief Taylor of Officer Daugreilh's use of force, and Officer Daugreilh was immediately placed on administrative leave. Chief Taylor also contacted the VSP and initiated an internal investigation. Officer Daugreilh resigned before the internal investigation was complete because he anticipated his employment would be terminated. On August 7, 2023, Officer Daugreilh pled guilty to a simple assault. Chief Taylor testified Officer Daugreilh's conduct and Sergeant Lawton's conduct were "similarly the same[.]" (Doc. 61-21 at 69.)

## III. Disputed Facts.

The parties dispute whether the City and Chief Taylor created the Response to Resistance Policy. Chief Taylor asserts a version of the Response to Resistance Policy was used by police departments throughout Vermont. Although no formal statewide policy was in place, the City and Chief Taylor claim that the City adopted a pre-existing policy rather than authoring its own.

Plaintiff asserts the SAPD's practice and custom was for sergeant-supervisors to review and sign their own RTR forms, allowing them to unilaterally approve their own

12

uses of force. She contends that Lieutenant Wetherby acknowledged this policy seemed "strange[,]" (Doc. 61-20 at 36), and that Chief Taylor admitted that this reflected "an unintentional error[]" in the Response to Resistance Policy. (Doc. 61-21 at 24.) The City and Chief Taylor acknowledge that supervisors have a responsibility to report suspected police misconduct to their superiors. They, however, dispute Plaintiff's interpretation of the Response to Resistance Policy and dispute that a custom of officers reviewing their own use of force existed.

Claiming Sergeant Lawton continued his use of improper force, at least in part, because he did not receive "feedback" from his superiors during his five prior uses of force, Plaintiff argues the absence of "feedback" was part of a SAPD custom or practice. She cites Sergeant Lawton's understanding that RTR forms were reviewed by a superior and that if he was not contacted regarding an RTR form he was "good to go." (Doc. 78-1 at 4, ¶ 36) (internal quotation marks omitted). The City and Chief Taylor counter that Plaintiff proffers no evidence that Sergeant Lawton's prior uses of force were unlawful or that his prior conduct required an intervention due to a lack of instruction or guidance.

Chief Taylor contends the terms of the collective-bargaining agreement between the City and the union "somewhat[]" hindered his ability to discipline officers. (Doc. 63-4 at 41.) He further cites Vermont statues which provide that "[t]he legislative body, and in its stead, the town manager . . . may . . . appoint police officers[.]" 24 V.S.A. § 1931(a). When "the appointing authority" suspects a police officer of misconduct, the appointing authority "shall set a date for a hearing before the legislative body" which "may suspend such officer from duty pending a hearing." *Id.* § 1932(a). The "legislative body" has the authority to remove or suspend an officer who is found guilty of misconduct. *Id.* § 1932(d). The City's municipal charter adopts a "council-manager form of government[,]" wherein "all powers of the City shall be vested in an elective council, hereinafter referred to as the City Council, which shall enact ordinances, codes, and regulations, adopt budgets, determine policies, and appoint the City Manager, who shall execute the laws and administer the government of the City." 24 V.S.A. app. ch. 11 § 4.

13

Plaintiff asserts Chief Taylor's ability to discipline officers was not impacted by the collective-bargaining agreement because it only provided officers with an opportunity to appeal. She contends Chief Taylor possessed the statutory authority to direct and control the SAPD. *See* 24 V.S.A. § 1931(b) ("The direction and control of the entire police force, except as otherwise provided, shall be vested in the chief of police.").

## IV. Whether Sergeant Lawton Is Deemed to Have Admitted the Allegations in the Complaint.

Plaintiff contends that, because Sergeant Lawton has not specifically denied the allegations in her Complaint, they must be deemed admitted under Fed. R. Civ. P. 8(b)(6).[7] Sergeant Lawton timely filed an answer on February 14, 2022, in which he asserted his Fifth Amendment privilege against self-incrimination for every allegation in the Complaint. Approximately one year after he pled guilty to simple assault, Sergeant Lawton was deposed and answered questions without asserting his Fifth Amendment privilege.

In a civil case, the assertion of a Fifth Amendment privilege may have adverse consequences. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (holding "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[]"); *Mirlis v. Greer*, 952 F.3d 36, 44-45 (2d Cir. 2020) (affirming district court's instruction to jury that they "may, but are not required to, infer" from the witness's invocation of the privilege against self-incrimination that his "answer would have been adverse to [his] interest[]") (alteration adopted) (internal quotation marks omitted). "[A] party who asserts the privilege against self-incrimination must bear the consequence of lack of

---

[7] Fed. R. Civ. P. 8(b)(6) provides: "An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided." "[A] defendant's failure in its answer to properly deny a factual allegation contained in the plaintiff's complaint may constitute an admission under Rule 8[(b)(6)] of the Federal Rules of Civil Procedure, sufficient to preclude the defendant from disputing the asserted fact during a subsequent summary judgment motion." *See Dawkins v. Williams*, 511 F. Supp. 2d 248, 270 (N.D.N.Y. 2007) (footnote omitted).

evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (internal quotation marks and citation omitted).

Plaintiff's statement of undisputed material facts contains allegations from her Complaint. Sergeant Lawton does not dispute these specific allegations. The court thus need not address at this time whether his assertion of his Fifth Amendment privilege gives rise to an adverse inference because the allegations of Plaintiff's Complaint are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6).

## V.     Conclusions of Law and Analysis.

### A.     Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

15

477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017)).

## B. Whether Plaintiff Is Entitled to Summary Judgment on her Battery Claim (Count III).

Plaintiff asserts the undisputed facts establish Sergeant Lawton is liable for battery and he is precluded from arguing he did not assault or batter her because he pled guilty to substantially the same elements of these claims in his criminal proceedings. Sergeant Lawton concedes this point and does not address Plaintiff's collateral estoppel argument. Battery is "an intentional act that results in harmful contact with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746, 749 (citing Restatement (Second) of Torts § 13 (1965)). Because it is undisputed that Sergeant Lawton pled guilty to intentionally punching Plaintiff in the face with a closed fist, causing a contusion,

16

Sergeant Lawton is liable for battery as a matter of law. Plaintiff's motion for summary judgment on her battery claim is GRANTED.

### C.   Whether the Court Should Deny Plaintiff's Request for Summary Judgment on her Remaining Claims Against Sergeant Lawton Because They Are Duplicative.

Sergeant Lawton seeks dismissal of Plaintiff's assault and Fourth Amendment claims on the grounds that they are duplicative. He further seeks to limit Plaintiff's compensatory and punitive damages so that Plaintiff does not recover twice for the same injuries. Sergeant Lawton's concerns are misplaced.

> Whether or not a defendant is liable to a plaintiff under one or many theories of liability does not affect the damages award because the amount of compensatory damages awarded is not dependent on the number of theories that plaintiff alleges and under which it may recover. Rather, the amount of damages depends on the extent of the injury suffered.

*Bingham v. Zolt*, 66 F.3d 553, 564 (2d Cir. 1995).

Although Plaintiff's assault, battery, and excessive force claims involve similar facts, they are distinct causes of action that require proof of different elements.[8] Plaintiff has clarified that she is solely seeking summary judgment on the issue of liability, not damages. *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016) (explaining courts may grant partial summary judgment with respect to liability). At the summary judgment stage, Plaintiff may pursue alternate theories of liability. *See Zeranti v. United States*, 358 F. Supp. 3d 244, 260 n.10 (W.D.N.Y. 2019) (stating that Fed. R. Civ. P. 8(d)(3) permits a plaintiff to "pursue alternative theories of liability . . . and it is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation[]") (internal quotation marks and citation omitted). As trial approaches, the court will address whether Plaintiff must make an election

---

[8] *Compare Christman v. Davis*, 2005 VT 199, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746, 749 (stating battery requires "an intentional act that results in harmful contact with another[]"), *with Newell v. Whitcher*, 53 Vt. 589, 591 (1880) (concluding that conduct threatening harmful physical contact, without such contact occurring, is "an assault[]" where the defendant is "so near as to excite the fear and apprehension of force"), *and Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (stating a § 1983 claim requires the defendant to be "acting under color of state law").

regarding the theory of liability on which she seeks to proceed or whether that issue should be addressed in the court's instructions to the jury. *See Kibbie v. Corum Mabie Cook Prodan Angell & Secrest, PLC*, 2018 WL 4258114, at *3-4 (D. Vt. Sept. 6, 2018) (noting that generally "problems of duplicative pleading and of overlapping theories of recovery are best resolved at trial through the use of a jury instruction"). Likewise, the court's jury instructions and verdict form generally suffice to prevent a double recovery.

### D. Whether Plaintiff Is Entitled to Summary Judgment on her Assault Claim Against Sergeant Lawton (Count II).

Plaintiff argues the undisputed facts demonstrate that Sergeant Lawton is liable for a civil assault and he is collaterally estopped from arguing otherwise. "Collateral estoppel, also called issue preclusion, bars a party from relitigating an issue decided in a previous action." *In re M.V.*, 2022 VT 31, ¶ 26, 216 Vt. 491, 504, 282 A.3d 941, 951 (internal quotation marks and citation omitted). The Vermont Supreme Court has concluded that "a guilty plea may have a collateral-estoppel effect in subsequent civil proceedings." *Id.* at ¶ 35, 216 Vt. at 509, 282 A.3d at 954 (footnote omitted). Collateral estoppel applies when:

(1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier v. Getting Organized, Inc.*, 583 A.2d 583, 587 (Vt. 1990).

Because Sergeant Lawton was a party in his criminal case, the first element is met. "To determine whether the second, third, and fourth criteria are also satisfied, [the court] must identify what is at issue here and what was at issue in the [prior proceeding]." *Trahan v. Trahan*, 2003 VT 100, ¶ 8, 176 Vt. 539, 541, 839 A.2d 1246, 1248. Under Vermont tort law, assault is "any gesture or threat of violence exhibiting an intention to assault, with the means of carrying that threat into effect . . . unless immediate contact is impossible." *Bishop v. Ranney*, 7 A. 820, 820-21 (Vt. 1887) (internal quotation marks omitted). An assault "creates a reasonable apprehension of immediate physical injury to a human being." *Id.* (internal quotation marks and citation omitted). "If the party

threatening the assault has the ability, means, and apparent intention, to carry his threat into execution, it may in law constitute an assault." *Wilson v. Smith*, 477 A.2d 964, 965 (Vt. 1984) (alteration and internal quotation marks omitted) (quoting *Clark v. Downing*, 55 Vt. 259, 262 (1882)). Under 13 V.S.A. § 1023(a)(1), a person "is guilty of simple assault if he or she . . . attempts to cause or purposely, knowingly, or recklessly causes bodily injury to another[.]"

Sergeant Lawton pled guilty to knowingly causing a bodily injury to Plaintiff, however, the criminal proceedings do not establish that Plaintiff reasonably apprehended a harmful or offensive touch before it occurred. As Plaintiff was intoxicated and as the push, punch, and takedown occurred without warning, whether she anticipated immediate physical injury is a question of fact.

The fourth and fifth elements of collateral estoppel require consideration of "the circumstances of [the] case[,]" weighing factors such as "the type of issue preclusion, the choice of forum, the incentive to litigate, the foreseeability of future litigation, the legal standards and burdens employed in each action, the procedural opportunities available in each forum, and the existence of inconsistent determinations of the same issue in separate prior cases." *Trepanier*, 583 A.2d at 587. Although offensive collateral estoppel is "more controversial[,]" Sergeant Lawton had the incentive to fully litigate the issues in his criminal proceeding because his "liberty interests were at stake," he was protected by "significant procedural safeguards" when pleading guilty, the burden of proof was substantially higher, and the application of collateral estoppel would not create inconsistent determinations of the same issue. *In re M.V.*, 2022 VT 31, ¶¶ 41, 44, 46, 216 Vt. at 512-14, 282 A.3d at 956-58. Accordingly, some but not all of the requirements of collateral estoppel have been satisfied. The remaining issue for trial is whether Plaintiff had "a reasonable apprehension of immediate physical injury[.]" *Bishop*, 7 A. at 821.

Because there is a question of fact regarding Plaintiff's apprehension of harm and whether that apprehension was objectively reasonable, the court DENIES Plaintiff's motion for summary judgment on her assault claim.

E.     **Whether Plaintiff Is Entitled to Summary Judgment on her Excessive Force Claim Against Sergeant Lawton Brought Under 42 U.S.C. § 1983 (Count I).**

Plaintiff seeks summary judgment on her claim that Sergeant Lawton violated her Fourth Amendment rights pursuant to 42 U.S.C. § 1983 when he punched her in the face because no reasonable juror could find this conduct objectively reasonable under the circumstances. According to Sergeant Lawton, Plaintiff's excessive force claim is governed by the Fourteenth Amendment and there is a material question of fact regarding whether he had the requisite state of mind.

42 U.S.C. § 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A claimant must establish the person who committed the violation was acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). He or she also "must p[rove] that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) (alteration in original).

The Fourth Amendment governs "a claim for excessive force after [the plaintiff] has been arrested and detained, but 'prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.'" *Cugini v. City of N.Y.*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)). "To establish a claim of excessive force, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Davis v. Rodriguez*, 364 F.3d 424, 431 (2d Cir. 2004) (internal quotation

20

marks and citation omitted). Reasonableness in the Fourth Amendment context is not "an easy-to-apply legal test" and requires courts to "slosh [their] way through [a] factbound morass[.]" *Scott v. Harris*, 550 U.S. 372, 383 (2007). This fact-specific inquiry "requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

Factors to consider, at minimum, include: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* "Though the Second Circuit has not yet ruled on the issue, many courts have viewed the 'immediate threat to the safety of the officers or others' as the most important . . . factor." *Ramos v. Town of E. Hartford*, 2019 WL 2785594, at *7 (D. Conn. July 2, 2019) (quoting *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)). "A plaintiff must also demonstrate that the officer was made reasonably aware that the force used was excessive." *Cugini*, 941 F.3d at 612. Reasonableness of the use of force "must [be] judge[d] . . . from the perspective of a reasonable officer on the scene[]" and embody "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

Sergeant Lawton argues there is a disputed question of fact because he asserts he did not act with wantonness or malice, however, "[o]nce it is demonstrated that an individual police officer intended to use force of some kind, the subjective motivations of that officer simply have no bearing on whether the particular degree of force used is unreasonable and excessive under the Fourth Amendment[.]" *Tardif v. City of N.Y.*, 991 F.3d 394, 414 (2d Cir. 2021).

Plaintiff was not arrested for a serious crime nor was the force used against her an attempt to detain her. *See Linton v. Zorn*, 2022 WL 17080324, at *10 (D. Vt. Oct. 19,

2022) (stating unlawful trespass is "not a particularly severe crime[]") (internal quotation marks omitted). Although Plaintiff was under investigation for a potential assault at the bar, a significant period of time elapsed between that conduct and the events in the holding cell. *Bryant v. Meriden Police Dep't*, 2017 WL 1217090, at *8 (D. Conn. Mar. 31, 2017) ("The seriousness of the suspected crime as a proxy for the need to use force becomes less helpful as more time passes between the initial interaction and the use of force.") (citing *Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998)). During that elapse in time, Plaintiff was combative and non-compliant with law enforcement directives. Nevertheless, when Sergeant Lawton punched Plaintiff in the face, she was intoxicated, handcuffed, and confined in a small holding cell. She was not a risk of flight. She was also arguably not a viable threat to officer safety. *See Bryant*, 2017 WL 1217090, at *12 (observing that because plaintiff was unarmed, detained in holding cell, in the presence of multiple officers, and only passively resisting strip search, "[i]t was not reasonable to believe that [plaintiff] posed a threat to officer safety[]").

Although Plaintiff kicked Sergeant Lawton in the shin and refused to sit down, punching her in the face with a closed fist was not in self-defense. Sergeant Lawton has admitted as much in his guilty plea. *See Smith v. Conway Cnty.*, 759 F.3d 853, 860 (8th Cir. 2014) (assuming arguendo that first use of taser was justified to subdue the plaintiff who allegedly intentionally kicked an officer, second use of taser would be unreasonable if it occurred after the plaintiff was no longer resisting or posing a threat); *see also Burwell v. Peyton*, 131 F. Supp. 3d 268, 297 n.23 (D. Vt. 2015), *on reconsideration in part*, 2015 WL 6874250 (D. Vt. Nov. 9, 2015), *and aff'd sub nom.*, *Burwell v. Moody*, 670 F. App'x 734 (2d Cir. 2016) (concluding the plaintiff's injuries were sufficiently serious to maintain excessive force claim where the plaintiff was "pepper sprayed twice, beaten with multiple strikes of a baton, and suffered a laceration which required stitches and caused scarring[]"). Against this backdrop, no reasonable juror could conclude Sergeant Lawton's use of force was not excessive. *See Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993) ("There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court.").

For the reasons set forth above, the court GRANTS Plaintiff's motion for summary judgment regarding Sergeant Lawton's liability for using excessive force in violation of the Fourth Amendment.

### F.     Whether Plaintiff Is Entitled to Summary Judgment on her Claims Against the City Under 42 U.S.C. § 1983 (Count I).

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be liable under 42 U.S.C. § 1983 for its employees' unconstitutional acts "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). A municipality is "responsible only for [its] *own* illegal acts[,]" and is "not vicariously liable under § 1983 for [its] employees' actions." *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (internal quotation marks and citations omitted); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*.") (citations omitted). "Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Coon v. Town of Springfield*, 404 F.3d 683, 686 (2d Cir. 2005) (quoting *Monell*, 436 U.S. at 694)).

"[A] plaintiff must demonstrate that through its *deliberate* conduct, the municipality was the moving force behind the injury alleged[.]" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97-98 (2d Cir. 2020) (internal quotation marks and citations omitted). To assert a *Monell* claim, a plaintiff must prove: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (internal quotation marks omitted)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023)

23

(internal quotation marks omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). As the Second Circuit has observed,

> The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees[.]

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (alterations adopted) (internal quotation marks and citations omitted). "A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).

Although "a municipal policy or ordinance [that] is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation," *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125-26 (2d Cir. 2004), "[a] municipality's policy of inaction in light of notice of constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (internal quotation marks omitted) (second brackets in original). "In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Id.* at 297-98 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)).

In some circumstances, a municipality's failure to train or supervise local government employees "about their legal duty to avoid violating citizens' rights" may "rise to the level of an official government policy" for § 1983 purposes. *Connick*, 563 U.S. at 61. A municipality's "failure to train or supervise city employees may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 196 (citing

24

*City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). "To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones,* 691 F.3d at 81. "[D]eliberate indifference . . . is a stringent standard of fault[.]" *Brown,* 520 U.S. at 410. "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.,* 361 F.3d at 128 (citation omitted).

The Second Circuit has identified three requirements that "must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens[:]" (1) "a policymaker knows to a moral certainty that [his or] her employees will confront a given situation[,]" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation[,]" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotation marks and citations omitted).

For a failure to train claim:

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick,* 563 U.S. at 62 (internal citations omitted) (quoting *Brown,* 520 U.S. at 409). A *Monell* claim "is at its most tenuous" when it is based on a failure to train. *Id.* at 61.

For the purposes of a failure to supervise claim, the "plaintiff['s] evidence must establish only that a policymaking official had notice of a potentially serious problem of

unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty Am.*, 361 F.3d at 128 (internal citation omitted).

### 1.     Whether Plaintiff Has Established a Formal Policy.

Plaintiff contends the Response to Resistance Policy is an official municipal policy that unambiguously allowed sergeants to review their own RTR forms and unilaterally determine whether their use of force was appropriate. To establish this policy, she cites evidence that on at least five occasions prior to her incident Sergeant Lawton signed his own RTR forms as a supervisor and they were filed without review or signature by a lieutenant or Chief Taylor. The City counters that the Response to Resistance Policy was not an official municipal policy because Chief Taylor, who was not a final policymaker, adopted it. Even if the Response to Resistance Policy was an official policy, at best, it was ambiguous as to whether a sergeant could review his or her own use of force.

To the extent the City argues that the Response to Resistance Policy was not an official municipal policy because it was only signed by Chief Taylor, it has admitted that "*the City* had in effect a written policy entitled 'Response to Resistance.'" (Doc. 63-2 at 7, ¶ 50) (emphasis supplied), and it is bound by that admission. *See* Fed. R. Civ. P. 56(c)(1)(A) (stating party may rely on "admissions[]" to establish fact is not "genuinely disputed"). The issue of whether Chief Taylor was an official policymaker for purposes of adopting the Response to Resistance Policy has thus been waived.

The Response to Resistance Policy does not define "officer" or "supervisor" and states RTR forms will be submitted to "the Patrol Commander for review." (Doc. 61-15 at 5.) An ambiguity regarding who should review a sergeant's RTR form is not sufficient to establish an official municipal policy. *See Rudavsky v. City of S. Burlington*, 2021 WL 1894780, at *11 (D. Vt. May 11, 2021) (concluding that "the lack of a written definition" for certain words in a police department's policy that officers could "exploit" as "loopholes[]" was insufficient to establish the existence of an official municipal policy).

26

There is thus a genuine issue of material fact as to whether Sergeant Lawton acted "pursuant to" the Response to Resistance Policy when he filled out the supervisor section of his RTR forms and whether Lieutenant Wetherby and Chief Taylor acted "pursuant to" the Response to Resistance Policy when they did not immediately review Sergeant Lawton's RTR forms to evaluate whether he used excessive force.

### 2. Whether Plaintiff Has Established a Custom or Widespread Practice.

Even if the Response to Resistance Policy is ambiguous, Plaintiff contends Sergeant Lawton's practice was a custom or widespread practice within the SAPD. "[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am.*, 361 F.3d at 126. "'[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability.'" *Elnicki v. City of Rutland*, 2019 WL 131858, at *8 (D. Vt. Jan. 8, 2019) (quoting *Jones*, 691 F.3d at 81). Plaintiff cites no evidence that any sergeant other than Sergeant Lawton reviewed his or her own RTR forms. Although Sergeant Lawton filed five unreviewed RTR forms prior to the incident with Plaintiff, three of which involved striking a detainee and causing injury, this is insufficient to establish a "persistent and widespread practice" of constitutional violations within the SAPD. *Connick*, 563 U.S. at 61 (internal quotation marks and citation omitted); *see also Jones*, 691 F.3d at 85 (holding that three incidents "fell far short of showing a policy, custom, or usage of officers"); *Brush v. Old Navy LLC*, 2023 WL 5311434, at *32 (D. Vt. Aug. 17, 2023) ("A single dated and dissimilar prior incident does not provide adequate notice."); *Norton v. Town of Islip*, 2016 WL 264930, at *7 n.10 (E.D.N.Y. Jan. 21, 2016) (noting "two, three, or even four incidents" by non-policymakers is unlikely to support inference of widespread policy or custom). This is especially true where, as here, Plaintiff has not established that Sergeant Lawton's prior uses of force were unlawful.

### 3.   Whether Plaintiff Has Established a Policy of Failing to Train.

"Where . . . a city has a training program, a plaintiff must . . . identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Wray*, 490 F.3d at 196 (internal quotation marks omitted). Plaintiff has not identified any deficiency in the City's training or a lack of training that caused her injuries. *See Felix v. City of N.Y.*, 2020 WL 6048153, at *4 (S.D.N.Y. Oct. 13, 2020) ("To be sure, a municipality may not be held liable for a failure to train because an officer flouts their training.") (citing *Amnesty Am.*, 361 F.3d at 130); *Brush*, 2023 WL 5311434, at *32 ("Absent proof of 'particular omission[s]' and 'actual or constructive notice' of those omissions, [the p]laintiff cannot maintain a *Monell* claim against [a municipality] on a failure to train or supervise basis.") (first alteration in original) (quoting *Connick*, 563 U.S. at 61).

### 4.   Whether Plaintiff Has Established Causation for her Failure to Train or Supervise Claim.

Even if Plaintiff could establish an official policy, her claim would fail on the further ground that she cannot show causation. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.* at 415.

For her failure to supervise claim, Plaintiff "must prove in the end that the [City's] inadequate supervision actually caused or was the moving force behind the alleged violations." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). It is not enough that a policy or policymaker's decision made a violation of the plaintiff's constitutional rights "more likely[.]" *Brown*, 520 U.S. at 410. The chain of causation may also be "broken by the intervening exercise of independent judgment." *Townes v. City of N.Y.*, 176 F.3d 138, 147 (2d Cir. 1999).

Plaintiff cites no evidence that Sergeant Lawton's prior uses of force were excessive and therefore unlawful. Even if she could do so, a "pattern of illegal conduct . . . cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality; instead, there must be more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct." *Lucente*, 980 F.3d at 306 (internal quotation marks and citation omitted). Although Plaintiff argues that some SAPD officers have used excessive force in the past, she does not cite evidence that these events were caused by the Response to Resistance Policy. *See Brush*, 2023 WL 5311434, at *31 (concluding the plaintiff's identification of "various reports of misconduct and poor management" was insufficient to establish a causal connection because it was "now apparent how they would have put policymakers on notice of possible Fourth Amendment violations[]"). The undisputed facts do not establish the City maintained a policy, practice, or custom that was the "moving force" behind the alleged violations of Plaintiff's constitutional rights. *Reynolds*, 506 F.3d at 193.

For the foregoing reasons, the court DENIES Plaintiff's motion for summary judgment on her *Monell* claim against the City.

## G.     Whether Plaintiff Is Entitled to Summary Judgment on her *Respondeat Superior* Claims Against Chief Taylor.

Plaintiff moves for summary judgment on her state law claims of *respondeat superior* which, under Vermont law, is based upon a common law doctrine that: "an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1090 (Vt. 1999).

Plaintiff's Complaint states: "[The City] and [Chief Taylor] have negligently failed to screen, control, train, supervise[,] and discipline police officers under their command, including [Sergeant Lawton] and [Officer Koch] regarding the constitutional rights of citizens and persons thereby causing police officers, including [Sergeant Lawton] and [Officer Koch][,] to engage in the unlawful conduct complained of herein." (Doc. 1 at 8, ¶ 50.) As Chief Taylor points out, a claim of *respondeat superior* is not

found therein. Plaintiff's Complaint cannot be amended through her brief. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) ("A party is not entitled to amend its complaint through statements made in motion papers[.]"). Even if Plaintiff properly pleaded this claim, under Vermont law, a plaintiff must allege and establish "an employer-employee relationship" and that the defendant's employee committed "tortious acts . . . during, or incidental to, the scope of employment." *Kuligoski v. Rapoza*, 2018 VT 14, ¶¶ 13, 207 Vt. 43, 49, 183 A.3d 1145, 1150 (internal quotation marks and citation omitted).

Plaintiff's request for summary judgment against Chief Taylor in his official capacity is, in effect, one against the City and municipal immunity bars her recovery. *See Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018), *aff'd*, 592 U.S. 43 (2020) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal quotation marks and citation omitted); *Simuro v. Shedd*, 176 F. Supp. 3d 358, 371 (D. Vt. 2016) (applying municipal immunity under Vermont law to respondeat superior claim for conduct of municipality's law enforcement officers).

There is also no evidence that Chief Taylor, in his individual capacity, was Sergeant Lawton's employer. He therefore cannot be liable under a *respondeat superior* theory. *See LeClair v. LeClair*, 2017 VT 34, ¶ 37, 204 Vt. 422, 443 169 A.3d 743, 756 (defining "master" as "a principal who employs and agent to perform services in his affairs and who controls or has the right to control the physical conduct of the other in performance of the service[]") (quoting Restatement (Second) of Agency § 2(1) (1958)).

For the reasons stated above, Plaintiff's request for summary judgment against Chief Taylor on a theory of *respondeat superior* is DENIED.

**H.    Whether Chief Taylor Is Entitled to Summary Judgment on Plaintiff's Claim Against him in his Official Capacity Brought Under 42 U.S.C. § 1983 (Count I).**

Chief Taylor argues the claim against him in his official capacity is duplicative of Plaintiff's claim against the City and that Plaintiff has abandoned any claims against him in his official capacity because she failed to respond to this argument in her opposition.

"[W]hen a counseled party moves for summary judgment, a partial response by the non-movant arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (alterations adopted) (internal quotation marks and citation omitted). "A claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself, rather than a suit against the individual personally, for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]'" *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Monell*, 436 U.S. at 691 n.55). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012). Chief Taylor's motion for summary judgment on Plaintiff's § 1983 claim against him in his official capacity is therefore GRANTED.

**I.    Whether Chief Taylor Is Entitled to Summary Judgment on Plaintiff's Claims Against him in his Individual Capacity Brought Under 42 U.S.C. § 1983.**

Chief Taylor contends he is entitled to summary judgment with regard to any claims asserted against him in his individual capacity as well because he had no personal involvement in the alleged constitutional violation. In the alternative, he argues he is entitled to qualified immunity for his conduct.

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A plaintiff must "establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights." *Tangreti*, 983 F.3d at 618 (internal quotation marks and citation omitted). "A supervisor may not be held liable under [§] 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Iqbal*, the Supreme Court clarified that "the term 'supervisory liability' is a misnomer[,]" because "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. at 667. After *Iqbal*, "there is no special rule for supervisory liability," *Tangreti*, 983 F.3d at 618, instead, "[t]he [alleged constitutional] violation must be established against the supervisory official directly" and "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 616 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). Accordingly, the "factors necessary to establish" a supervisor violated the plaintiff's constitutional rights "will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Id.* (internal quotation marks and citation omitted). "The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Id.* at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010)).

Generally, a supervisor may be held liable as a "direct participant" in a constitutional violation only where he or she "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (internal quotation marks and citation omitted). It has also been stated that "'direct participation' by a supervisor in a constitutional violation 'requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Ruggiero v. Cnty. of Orange*, 2023 WL 7005074, at *11 (S.D.N.Y. Oct. 24, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). There is no

32

evidence that Chief Taylor was personally involved in Plaintiff's incident or that he authorized, ordered, or helped others to commit it. *See Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) ("If a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.") (emphasis in original); *see also Porro*, 624 F.3d at 1327 (concluding the plaintiff failed to establish the sheriff personally violated his rights where the sheriff "did not employ any force on [the plaintiff,]" "was not present when the force was applied[,]" and did not give "any advance approval to the use of a taser on [the plaintiff]"). To the contrary, he first learned of the incident approximately two months after it occurred and only pursuant to a public records request.

Arguing Chief Taylor's policies can constitute personal involvement, Plaintiff cites *Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986), in which the Second Circuit held that a municipality may be liable under § 1983 for its "policy of deliberate indifference to the constitutional rights of persons within its domain" based on an official "policy that is not itself unconstitutional but that merely permits or tolerates unconstitutional acts by [municipal] employees[.]" *Id.* at 326. Plaintiff does not cite authority for the proposition that a *supervisor* may be individually liable for implementing a policy that required inadequate or non-existent review of a use of force. For this reason, courts have dismissed excessive force claims against supervisors for lack of personal involvement where the basis of the claim is a failure to supervise or

33

discipline.[9] The court thus GRANTS Chief Taylor's motion for summary judgment with regard to Plaintiff's § 1983 claim for lack of personal involvement.[10]

## J.     Whether Chief Taylor Is Entitled to Summary Judgment on Plaintiff's Negligence Claim (Count VI).

Chief Taylor contends Plaintiff has abandoned her negligence claim against him because she did not brief this issue in her opposition to his motion for summary judgment. He further argues he is entitled to qualified immunity under Vermont law.

"[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). "[D]istrict courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition[,]" a practice that has been "expressly approved . . . in the context of summary judgment motions[.]" *Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 11 (2d Cir. 2020); *see also Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) (holding that "[b]ecause plaintiff's opposition papers did not address defendants' motion for summary judgment on [a] claim, [that] claim is deemed abandoned and summary judgment could be granted on that basis alone").

---

[9] *See, e.g., Valdez v. Macdonald*, 66 F.4th 796, 834 (10th Cir. 2023) (rejecting the plaintiff's argument that law clearly established that supervisors are liable when they "personally participate in a subordinate's violation of constitutional rights and when their failure to supervise results in a constitutional deprivation[]" because the plaintiff's framing was a "broad general proposition[]") (internal quotation marks and citation omitted); *Smith v. Kenny*, 2022 WL 1751047, at *2 (S.D.N.Y. May 31, 2022) (concluding the plaintiff's allegation that supervisor-defendants were "responsible" for conduct of subordinate law enforcement officers "because they inadequately supervised them[]" was "insufficient to establish personal involvement[]"); *Kistner v. City of Buffalo*, 2023 WL 144915, at *14-15 (W.D.N.Y. Jan. 10, 2023) (concluding plaintiff failed to establish defendant-supervisor's "personal involvement" in excessive force where plaintiff claimed defendant-supervisor tacitly approved of excessive force "by failing to discipline" officers).

[10] In the absence of evidence that Chief Taylor was personally involved in a violation of Plaintiff's constitutional rights, "no further inquiry is necessary [into Chief Taylor's qualified immunity argument] because where there is no viable constitutional claim, defendants have no need of an immunity shield." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (internal quotation marks and citation omitted).

The Second Circuit has observed that:

> "[p]leadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them." And insofar as summary judgment "is known as a highly useful method of narrowing the issues for trial," it follows that "preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses."

*Kovaco*, 834 F.3d at 143 (quoting *Jackson*, 766 F.3d at 196) (internal footnotes omitted) (alteration in original). Summary judgment may therefore "include a finding of abandonment of undefended claims or defenses." *Jackson*, 766 F.3d at 198.

While Plaintiff responded to Chief Taylor's argument that he is entitled to qualified immunity under federal law for her § 1983 claim, she did not address Chief Taylor's request for dismissal of her negligence claim. Her negligence claim has therefore been abandoned. For this reason, Chief Taylor's motion for summary judgment with respect to Plaintiff's negligence claim is GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment (Doc. 61) and GRANTS Chief Taylor's motion for summary judgment (Doc. 63).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _3rd_ day of May, 2024.

Christina Reiss, District Judge
United States District Court

35